

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-18-1994

# United States of America v. Menon

Precedential or Non-Precedential:

Docket 93-5399

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States of America v. Menon" (1994). *1994 Decisions.* Paper 21.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/21

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 93-5399
_____


UNITED STATES OF AMERICA

v.

THEKKEDAJH PEETHAMB MENON,

Appellant

_____

On Appeal From the United States District Court
for the District of New Jersey
(D.C. Crim. No. 92-00354-01)
_____


Argued: February 15, 1994

Before:  BECKER, HUTCHINSON and COWEN, Circuit Judges.

(Filed  May 18, 1994)


            JAMES D. CRAWFORD (Argued)
            THEODORE J. PICCONE
            Schnader, Harrison, Segal & Lewis
            1600 Market Street
            Suite 3600
            Philadelphia, PA  19103

                 Attorneys for Appellant


            MICHAEL CHERTOFF
            United States Attorney
            LESLIE FAYE SCHWARTZ (Argued)
            Assistant U.S. Attorney
            Office of United States Attorney
            970 Broad Street
            Newark, NJ  07102

_____

**OPINION OF THE COURT**

_____

BECKER, <u>Circuit</u> <u>Judge</u>.

Thekkedajh Menon appeals from a judgment in a criminal case in which he was convicted by a jury of violating 18 U.S.C. §§ 2[0] and 545[0] by knowingly and willfully, with intent to defraud the United States, making out and passing through the customhouse false and fraudulent invoices and other documents in order to conceal the identity of the exporters of certain products, and of violating those same sections by reimporting shrimp that had previously been rejected as contaminated by the Food and Drug Administration ("FDA").

_____

[0] 18 U.S.C. § 2(a) states that, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

[0] Paragraphs 1, 2 and 3 of § 545 state:

> Whoever knowingly and willfully, with intent to defraud the United States, . . . makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; . . .
>
> Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law . . .
>
> [s]hall be fined not more than $10,000 or imprisoned not more than five years, or both.

Menon's first contention on appeal, a contention he failed to raise in the district court and hence one that we review for plain error, is that to obtain a conviction for passing false invoices under § 545, the government must prove that he intended to deprive the United States of revenue, not just that he intended to evade federal regulations.  Menon's second argument is that the evidence was insufficient to show that he reimported previously rejected shrimp, a point which ultimately turns on whether a search of Menon's office which exceeded the scope of a search warrant was nonetheless valid under the "plain view" doctrine even though the agent who happened upon the documents at issue did not appreciate their significance until she brought them to a more knowledgable agent.

Agreeing with Menon's construction of the the first paragraph of § 545 and holding that the district court's construction constituted plain error, we reverse his convictions for passing false invoices through the customhouse.  The meaning of "defraud" varies from statute to statute, see McNally v. United States, 483 U.S. 350, 359, 107 S. Ct. 2875, 2881 (1987), and here the evidence supports Menon's interpretation of "defraud."  When Congress codified the criminal code, it changed the language of § 545 (then § 1593 of title 19 (U.S.C. 1940 ed.)) from "defraud the revenues of the United States" to "defraud the United States" but it did not mean to change the substance of the statute; it meant to continue the previous requirement of an intent to defraud the revenues of the United States.  Thus, we continue to give the statute its former meaning, and, finding

plain error on the basis that the district court's misinterpretation went to the existence vel non of criminal responsibility, we reverse Menon's convictions for passing false invoices. However, we affirm Menon's conviction for reimporting previously rejected shrimp, disagreeing with his contention regarding the illegality of the search, and his less significant assignments of error.

Because we have overturned Menon's convictions on most counts, we must remand for resentencing. On remand, the district court should not apply the enhancement for importation of seafood worth more than $2,000. Although Menon's conviction on Count 140 easily puts him over the $2,000 minimum for the enhancement, application of the enhancement is impermissible because it would violate the Ex Post Facto Clause of the Constitution. Although the enhancement was in effect at the time of Menon's sentencing, it was not in effect at the time of his conduct.

## I. FACTS AND PROCEDURAL HISTORY

The FDA is responsible for ensuring the safety of seafood entering the United States. In performing this function, the agency analyzes data to see if it establishes a pattern demonstrating that seafood which importers have bought from particular exporters is likely to be unsafe. Foreign exporters which have a history of shipping contaminated goods are placed on a block list; shipments from these exporters are automatically detained, and the importer must obtain a private laboratory

report demonstrating that the seafood is free of contamination before the FDA will release it. Other exporters are placed in an intermediate category, which means the FDA is more likely to sample their products before admitting them into the country than it is to sample those of other exporters.

Menon was President and two thirds owner of Flag Imports, Inc. ("Flag"), a business that purchased seafood both overseas and domestically for resale to distributors. On numerous occasions, Menon directed his employees to list falsely on invoices a different exporter of seafood than the one from which Flag had actually purchased the seafood. By listing exporters with no history of contamination rather than the actual exporters, who were either on the block list or subject to an increased risk of surveillance sampling by the FDA, Menon intended to deceive the FDA so that Flag's imports entered the United States more readily.

Nonetheless, the FDA discovered that one of Flag's shipments, a March 22, 1991 shipment of 1200 cases of shrimp, contained salmonella. It thereupon issued a Notice of Refusal of Admission for this shipment, and ordered that the cases be either exported or destroyed within 90 days. On May 25, 1991, Flag shipped the shrimp to Jabeco Transport ("Jabeco") in Rotterdam, Holland. The ultimate fate of that shrimp is a question of much moment in this case; the government contends that Menon illegally reimported it into the United States whereas Menon claims that there is insufficient evidence to prove reimportation beyond a reasonable doubt.

On January 19, 1993, a federal grand jury returned a 142-count indictment against Menon.  Counts 1 through 110 charged that, in violation of 18 U.S.C. §§ 2 and 545, see supra nn. 1 & 2, Menon did knowingly and willfully, with intent to defraud the United States, make out and pass through the customhouse, false and fraudulent invoices and other documents in order to conceal that the exporter of these products had been block-listed by the FDA.  Counts 111 through 139 charged Menon with similar conduct with respect to seafood obtained from exporters in  the intermediate category.  Count 140 charged Menon with reimportation of shrimp that had previously been rejected as contaminated by the FDA, also in violation of 18 U.S.C. §§ 2 and 545.  Finally, Counts 141 and 142 charged that, in violation of 16 U.S.C. § 3372(d) and 18 U.S.C. § 2, Menon knowingly made and used false invoices and decoy packaging to conceal that shipments identified as shrimp from Bangladesh were largely composed of frog legs subject to automatic detention and special permit requirements.

During the course of the jury trial, the government voluntarily dismissed counts 16 and 33 of the indictment.  At the close of the evidence, the district court granted a judgment of acquittal on Counts 141 and 142 (the frog legs counts).  On March 10, 1993, the jury found Menon guilty of all of the remaining counts.  Menon filed a motion for a judgment of acquittal on Count 140 alleging that the government had presented insufficient evidence of his guilt.  Menon also moved for a new trial, asserting that 1) the district court had improperly barred him

from presenting evidence that no one had ever reported being sick as a result of Flag seafood;[0] 2) Count 140, alleging reimportation of contaminated shrimp "contrary to law," was deficient for failing to specify the law to which the reimportation was contrary; and 3) evidence seized during a search of Flag's property should have been suppressed. The district court denied these motions.

The district court held a sentencing hearing after which it imposed concurrent sentences of 20 months on each of Counts 1 through 15, 17 through 32, and 34 through 140. The court also imposed concurrent terms of two years supervised release on each count of conviction, a total special assessment of $6,900, and a fine of $50,000. The adjusted offense level of 22, when combined with a Criminal History Category of I, resulted in a guideline range of 41-51 months. The district court then departed downward from this range based on the severe mental problems of Menon's wife.

Menon appeals the denial of his motions for judgment of acquittal and for a new trial as described on p.6 supra. On appeal, Menon presses two additional arguments. First, he asserts that his convictions for making out false invoices should be reversed because he did not intend to defeat the customs laws nor to defraud the United States government of money. Second, he submits that the district court's fourteen level increase to his

---

[0]Because Menon only argues that this evidentiary decision related to his convictions for employment of false invoices and we are reversing those convictions, we do not reach the evidentiary issue on appeal.

sentence violates the Ex Post Facto Clause of the Constitution. After considering the many difficult issues, we hold that paragraph 1 of § 545 does require an intent to deprive the United States of revenue and that Menon's convictions on counts 1-15, 17-32, and 34-139 should therefore be reversed. While we will uphold Menon's conviction on count 140 for reimportation of previously rejected shrimp, we agree with Menon that application of the sentencing enhancement for importation of valuable seafood violates the Ex Post Facto Clause and thus should not be repeated in his resentencing.

## II. THE MEANING OF 18 U.S.C. § 545

The jury convicted Menon of 137 counts of violating the first paragraph of 18 U.S.C. § 545. As we have noted supra at 2 n.2, this paragraph makes it illegal to "knowingly and willfully, with intent to defraud the United States, . . . make[] out or pass[], or attempt to pass through the customhouse any false, forged, or fraudulent invoice." The jury concluded that Menon, in his position as President of Flag, violated this provision by writing invoices that misrepresented the name of the seafood exporter from which Flag had bought the seafood it was importing. Menon contends that the district court misread § 545, because "an intent to defraud the United States" by passing false invoices "through the customhouse" requires 1) an intent to defeat the customs laws and 2) an intent to deprive the United States of revenue.

Menon's argument that § 545 requires an intent to deprive the United States of revenue would place a new gloss on a 45-year-old statutory provision that has been interpreted to the contrary by two courts of appeals, see United States v. Borello, 766 F.2d 46, 51 (2d Cir. 1985); United States v. McKee, 220 F.2d 266, 269 (2d Cir. 1955); United States v. Kurfess, 426 F.2d 1017, 1019 (7th Cir. 1970), cert. denied, 400 U.S. 830 (1970). Moreover, because Menon failed to argue in the district court that § 545 requires an intent to deprive the government of revenue, we review Menon's contention on appeal for plain error. See Fed.R.Crim.P. 30, 52(b).

Rule 52(b) provides that "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."  We find plain error "sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."  United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 1592 n.14 (1982)).  See also Government of Virgin Islands v. Smith, 949 F.2d 677, 681 (3d Cir. 1991).  We

> look on a case-by-case basis to such factors
> as the obviousness of the error, the
> significance of the interest protected by the
> rule that was violated, the seriousness of
> the error in the particular case, and the
> reputation of judicial proceedings if the
> error stands uncorrected -- all with an eye
> toward avoiding manifest injustice.

United States v. Thame, 846 F.2d 200, 205 (3d Cir. 1988).  Here, because "the challenge to the construction of the statute goes to the existence vel non of criminal responsibility, we think that

the error, if such it was, would affect [Menon's] due process rights and would constitute plain error." United States v. Cusumano, 943 F.2d 305, 309 (3d Cir. 1991).

In a very similar case, in which the plaintiff argued that the district court had improperly instructed the jury that the mail fraud statute did not require an intent to deprive another of money or property, we indicated that if the district court had given such an improper instruction, it would have constituted plain error. See United States v. Piccolo, 835 F.2d 517, 519 (3d Cir. 1987), cert. denied, 486 U.S. 1032, 108 S. Ct. 2014 (1988). As in that case, we think that, assuming Menon's interpretation of the statute is correct, the district court's failure to instruct the jury that § 545 requires an intent to deprive the government of money or property constituted manifest injustice and thus constituted plain error. And, despite the contrary decisions of two courts of appeals, we hold that Menon's interpretation of § 545 is correct.[0]

While the meaning of "defraud the United States" generally extends beyond defrauding the government of revenue, the history of § 545 demonstrates that Congress did not intend such a broad reading here. We first note that until recently, the Supreme Court generally interpreted "defraud" to extend to actions preventing the government from carrying out its lawful functions even when the government did not lose any revenue. This

---

[0]Because we agree with Menon that the first paragraph of § 545 requires an intent to deprive the government of revenue, we do not reach his contention that it requires an intent to defeat the customs laws.

interpretation took root in <u>Hammerschmidt v. United States</u> which analyzed the statutory predecessor of 18 U.S.C. § 37, a statute making it illegal to "conspire to . . . defraud the United States in any manner or for any purpose."  <u>See</u> 265 U.S. 182, 185, 44 S. Ct. 511, 511 (1924) (interpreting Comp. St. §10201).  In <u>Hammerschmidt</u>, the Supreme Court concluded that

> [t]o conspire to defraud the United States means primarily to cheat the Government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest.  It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention.

<u>Id.</u> at 188, 44 S. Ct. at 512.[0]

Recently, however, the Supreme Court has significantly narrowed the category of statutes in which the meaning of "defraud" extends beyond a deprivation of property rights.  In <u>McNally v. United States</u>, 483 U.S. 350, 359, 107 S. Ct. 2875, 2881 (1987), the Court interpreted the mail fraud statute, which made it illegal "to defraud" or to "obtain[] money by means of

---

[0]<u>See also</u> <u>United States v. Barnow</u>, 239 U.S. 74, 75, 36 S. Ct. 19, 20 (1915) (holding that 35 Stat. 1088, 1095 (1913), prohibiting individuals from "falsely assuming or pretending to be an officer or employe[e] acting under the authority of the United States" "[w]ith intent to defraud either the United States or any person" applied even when an individual did not demand or obtain anything of value); <u>United States v. Plyler</u>, 222 U.S. 15, 32 S. Ct. 6 (1911) (holding that § 5418 Rev, Rev. Stat., which prohibited the forging of any public record "for the purpose of defrauding the United States," applied regardless of pecuniary gain).

false or fraudulent pretenses," to require a finding that the defendant intended to deprive others of property or money. 18 U.S.C. § 1341.[0] In so doing, the Court rejected "a long line of court of appeals decisions that had interpreted the statute as proscribing schemes by government officials to defraud citizens of their intangible rights to honest and impartial government." United States v. Asher, 854 F.2d 1483, 1488 (3d Cir. 1988) (emphasis in original). In justifying its decision, the Court quoted Hammerschmidt, 265 U.S. at 188, 44 S. Ct. at 512, for the proposition that, "the words to defraud `commonly refer to wronging one in his property rights by dishonest methods or schemes.'" McNally, 483 U.S. at 359, 107 S. Ct. at 2881. The Court concluded that this common understanding combined with the rule of lenity meant that the mail fraud statute required an intent to deprive someone of money or property. See id.

The Court distinguished the actual ruling of Hammerschmidt on the basis that the mail fraud statute aimed to prevent fraud against any member of the public, while the statute discussed in Hammerschmidt aimed to protect the United States against fraud. A statute that has for its "`object the protection and welfare of the government alone'" aims to prevent fraud in a broader sense than deprivation of property rights, but a statute aiming to prevent fraud against members of the public

[0]Congress responded to McNally by adopting Pub.L. 100-690, Title VII, § 7603(a), Nov. 18, 1988 which states that, "[f]or the purposes of this chapter, the term, `scheme or artifice to defraud' includes scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

is likely using fraud in its usual, narrower sense.  Id. at 358,
107 S. Ct. at 2881 n. 8 (quoting Curley v. United States, 130 F.
1, 7 (1st Cir. 1904)).[0]

Another case distinguishing Hammerschmidt is United
States v. Cohn, 270 U.S. 339, 343, 46 S. Ct. 251, 252 (1926).
There the Supreme Court was faced with interpreting the meaning
of Section 35 of the Penal Code, 40 Stat. 1015 (1918), which
provided that actions "`for the purpose of obtaining or aiding to
obtain the payment or approval of' any `claim upon or against the
United States . . . for the purpose and with the intent of
cheating and swindling or defrauding the Government of the United
States' . . . shall be punishable."  The Court construed section
35 as requiring the defendant to cheat the government out of

---

[0]But cf. United States v. Tuohey, 867 F.2d 534 (9th Cir. 1989).
Tuohey  noted that

> despite the Court's dictum regarding section
> 371 in McNally, the McNally decision appears
> to leave the broad construction of "defraud"
> in section 371 in some doubt.  In McNally,
> the Court overruled virtually unanimous case
> law that had broadly defined "defraud" in the
> mail fraud context to extend to non-property
> "good government" frauds.  The similarities
> between section 371 and section 1341 are
> striking.  Both date from the same period in
> our history . . . . Both have long been read
> to extend to non-property frauds.  Both have
> been criticized as broad vague bases for
> criminal liability.

Id. at 536-37.  Nonetheless, as the Ninth Circuit ultimately
held, although the reasoning of McNally with respect to § 1341 is
in tension with that of Hammerschmidt with respect to § 371,
McNally did not overturn Hammerschmidt and in fact suggested that
Hammerschmidt applies to most statutes that contain the language
"defraud the United States."

property or money.  The Court distinguished Hammerschmidt on the grounds that the term defraud within section 35 "is used in connection with the words `cheating or swindling,' indicating that it is to be construed in the manner in which those words are ordinarily used, as relating to the fraudulent causing of pecuniary or property loss."  Id. at 346-47, 46 S. Ct. at 253.

The message we derive from this potpourri of Supreme Court cases is twofold.  First, the meaning of "defraud" must be interpreted in the context of the particular statute that uses the term.  In each case in which the Court has evaluated the meaning of "defraud," it has determined the intent of Congress based on the purpose of the particular statute and on the surrounding statutory language.  Second, an intent to defraud generally requires an intent to deprive someone of property or money but does not generally require such an intent in the context of statutes making it illegal to defraud "the United States."  It seems appropriate therefore to construe § 545 as prohibiting acts that prevent the United States from carrying out its statutory duties unless there is countervailing evidence on the meaning of the statute.

Here, strong countervailing evidence exists.  Menon points out that § 1593 of title 19 (U.S.C. 1940 ed.), the predecessor statute to 18 U.S.C. § 545, required that the defendant intended "to defraud the revenues of the United States" (emphasis added).  Although Congress left out the language "the revenues" when it recodified the federal criminal code in 1948, Menon contends that Congress made it clear that it did not

intend to make any substantive change in the statute by making this deletion. Thus, he concludes that the concept "defraud the revenues" is still a part of the statute.

As support for his view that Congress intended no substantive change, Menon cites the House Report which states that, "[r]evision [of the Criminal Code], as distinguished from codification, mean[s] the substitution of plain language for awkward terms, reconciliation of conflicting laws, omission of superseded sections, and consolidation of similar provisions." H.R. Rep. No. 304, 80th Cong., 1st Sess. (1947), reprinted in 18 U.S.C.A. 439, 440. The House Report does not indicate that substantive changes were included as part of the revision. See id. The House Report concludes that, "[t]he reviser's notes are keyed to sections of this bill and explain in detail every change made in text," id. at 448, and W.W. Barron, chief reviser of the code, testified to the House Committee on Revision of the Laws that "[e]very substantive change, no matter how minor, is fully explained [in the reviser's notes].". Id. at 460 (emphasis added).[0] Because the reviser's notes for § 545 say only that

_____

[0]Similarly, Charles Zinn, the Law Revision Counsel for the House Committee on the Judiciary, testified that:

> In the work of revision, principally codification, . . . keeping revision to a minimum, I believe the rule of statutory construction is that a mere change of wording will not effect a change in meaning unless a clear intent to change the meaning is evidenced . . . . It is clearly indicated in each of those revisers' notes whether any change was intended so that . . . a mere change in language will not be interpreted as

"[c]hanges were made in phraseology," H.R. Rep. No. 304, 80th

Cong., 1st Sess. at A46, and do not specify that any substantive

changes were intended, Menon concludes that the current statute,

like its predecessor, requires that the defendant have intended

to deprive the United States of revenues to which it was

entitled.[0]

    We agree.  Although we might ordinarily discount

legislative history, we are unwilling to do so where that history

consists of committee reports and statements by the chief reviser

and where the statutory change we are interpreting occurred in

---

> an intent to change the law unless there is
> some other clear evidence of an intent to
> change the law.

Hearing before Subcommittee No. 1 of the House Judiciary Committee on H.R. 1600 and H.R. 2055, 80th Cong., 1st Sess. (1947) (statement of Charles J. Zinn), reprinted in 18 U.S.C.A. 417, 515.

[0]Menon makes one additional argument.  He asserts that if we interpret § 545 as not requiring an intent to deprive the government of money, that section will become duplicative of §542, which makes it illegal to introduce "into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice."  18 U.S.C. § 542 (1988).

    However, §§ 542 and 545 overlap regardless of how we interpret § 545.  Because § 542 extends to any use of a fraudulent invoice for the purpose of importing goods into the United States, it will prohibit all conduct prohibited by § 545, i.e., every use of false invoices that pass through the customshouse, whether we interpret § 545 broadly or narrowly. This means that even if we interpret § 545 narrowly, the government will not be left without a remedy in future cases --it can choose to prosecute conduct such as Menon's under § 542 rather than under § 545.

    The converse is not true, however: section 542 applies to some conduct not covered by § 545 even if we interpret § 545 broadly.  That is because § 542 applies regardless of whom an actor is attempting to defraud, see 18 U.S.C. § 542, while § 545 requires a specific intent to defraud the United States.

the context of codification of the entire criminal code.  In that context, Congress was unlikely to have been able to carefully consider every change made to prior statutes.  We think it was reasonable for Congress to rely on representations made to it by the chief reviser, among others, that all substantive changes were explicitly set forth in the revisers' notes and for Congress to indicate that it intended no other substantive changes. Absent a compelling need, we should not read as substantive a change initiated by the revisers and probably not considered by Congress.

At a minimum, we think that the legislative history makes the meaning of "defraud the United States" in § 545 ambiguous given that, as we have seen, the meaning of defraud varies from statute to statute.  As the Court did in McNally, we rely on the rule of lenity to hold that because the meaning of defraud is ambiguous in the context of § 545, that section requires an intent to cause a deprivation of property or money. As Menon points out, and the government does not deny, the government made no showing that he had such an intent.  Thus, we must reverse his conviction on Counts 1–15, 17–31, and 33–139.

III. COUNT 140

Count 140 of the indictment charged Menon with violating the second paragraph of § 545.  That paragraph makes it illegal to "fraudulently or knowingly import[] or bring[] into the United States, any merchandise contrary to law."  18 U.S.C.

§545. The government contends that after it ordered Menon to export or destroy a certain shipment of contaminated shrimp under the authority of 21 U.S.C. § 381 (granting the FDA the authority to refuse to admit adulterated food into the United States), Menon exported the shrimp but then reimported it into the United States in violation of the order and of 21 U.S.C. § 331(a), which prohibits the introduction of any adulterated food into interstate commerce. Menon argues that 1) the indictment lacked the requisite specificity; 2) much of the evidence the government used to prove Menon's guilt was the fruit of an illegal search and hence should have been suppressed, and 3) there was insufficient evidence to convict. We reject all of these contentions.

### A. Specificity of the Indictment

> Count 140 of the indictment charges that Menon did: knowingly and willfully import merchandise into the United States contrary to law, in that the defendant did unlawfully reimport approximately 696 cartons of shrimp which had previously been rejected by the FDA because they were found to be contaminated by salmonella when they were originally imported by the defendant.

Menon argues that the indictment was defective because it indicated that he imported merchandise contrary to law but failed to specify which law. He asserts that, as a result, the indictment failed to provide him with adequate notice of the charge against which he had to defend himself.

Menon is correct that the indictment did not specify the statute he had violated; however, it did specify the actions Menon took in enough detail that proof by the government that he had taken these actions would have sufficed to prove that he had violated a particular law. The indictment clearly charged that Menon had reimported rejected and contaminated shrimp; such reimportation is illegal under 21 U.S.C. § 331, which prohibits introduction of adulterated food into interstate commerce. Thus, the factual specificity of the indictment was sufficient to put Menon on notice of the law he had allegedly offended. See United States v. Bowe, 360 F.2d 1, 8 (2d Cir.), cert. denied, 385 U.S. 961, 87 S. Ct. 401 (1966) (holding sufficient an indictment which did not cite the statute violated but which "advised the appellants of the essential elements of the offenses with which they were charged and stated facts showing the illegal aspects of the importation." The court explained that the claim of insufficiency was "`made in a mood of technicalism appropriate only to an era now fortunately past.'" Id. (citations omitted).)

As we explain in the margin, the cases upon which Menon relies are distinguishable, because all involved indictments that failed to specify facts sufficient to constitute a violation of any law.[0] In contrast, in this case, the indictment specified which of Menon's actions were contrary to law.

---

[0] In Keck v. United States, 172 U.S. 434, 19 S. Ct. 254 (1899), the Supreme Court held that an indictment charging the defendant with the importation of diamonds contrary to law was insufficient. The Court wrote:

B. <u>Legality of the Search</u>

1) Background

On April 15, 1992, government agents searched Menon's office and the desk of his secretary Cathy Carroll pursuant to a valid search warrant. The warrant authorized a search of these areas for "[o]riginals and copies of blank invoices bearing the name of Abad Fisheries," the company Menon often falsely listed as the exporter of seafood Flag was importing. (Search Warrant,

> The allegations of the count were obviously too general, and did not sufficiently inform the defendant of the nature of the accusation against him. The words, "contrary to law," contained in the statute, clearly relate to legal provisions not found in section 3082 itself; but we look in vain in the count for any indication of what was relied on as violative of the statutory regulations concerning the importation of merchandise. The generic expression "import and bring into the United States," did not convey the necessary information, because importing merchandise is not per se contrary to law, and could only become so when done in violation of specific statutory requirements.

<u>Id.</u> at 437, 19 S. Ct. at 455. <u>See also</u> <u>Steiner v. United States</u>, 229 F.2d 745, 748 (9th Cir. 1956) (holding indictments to be defective, because they "failed to state what law . . . the importation [of psittacine birds] was contary to, or in what respect such importation was contrary to law"); <u>Babb v. United States</u>, 218 F.2d 538, 541 (5th Cir. 1955) (holding that the "indictment should have alleged some fact or facts showing that the cattle in question were imported or brought in contary to some law; and that it is not enough to say that they were imported or brought in `contrary to law'"). In none of these cases did the indictment specify the statute defendant's actions were contrary to, or the actions defendant had taken that were sufficient to constitute a violation of law.

dated April 15, 1992).  In addition to the documents covered by the warrant, Michael I. Scott, Senior Special Agent with the United States Customs Service, who oversaw the search, instructed the agents to look for any other blank invoices and for documents regarding Jabeco, the company to which Flag had shipped the shrimp rejected by the FDA and from which he had allegedly reimported these shrimp (leading to his indictment in Count 140 for importing seafood contrary to law).

Scott assigned Ida Almeida to search Carroll's desk while Scott and other agents searched Menon's office.  When searching Carroll's desk, Almeida discovered a file marked Abad Fisheries which she brought to Scott, who was in the adjacent office.  She continued her search of the desk and found four documents with Jabeco's name on them which she also brought to Scott.[0]  Scott testified that when he glanced at one of the Jabeco documents, he noticed the words "Jabeco" and "reprocessing."  Because his prior investigation of Menon had revealed that Flag and Jabeco had collaborated on three prior illegal shipments of irradiated food, these words on the document signalled Scott that it evidenced criminal activity.  Scott then read the entire document and decided to seize it.  Because he assumed that the other documents were likely to be interrelated with the first one, he decided to seize them as well.[0]

---

[0]The government only introduced three of these documents into evidence; thus, the admissibility of the fourth document is not at issue.  MNT 6.

[0]As Scott was departing with these documents as well as others, Flag's controller, John Guerriero objected to the seizure of any documents other than those specified in the warrant.  JA 890.

Menon moved to suppress some of the evidence obtained in the April 15 search including the Jabeco documents, arguing that the agents had exceeded the scope of the warrant. The district court denied his motion, holding that the documents fell within the plain view doctrine because Scott only had to glance at the first Jabeco document in order to ascertain the probable incriminating nature of that document and because Scott had probable cause to conclude that the other documents were interrelated with that one. We agree.

2) Analysis

The Supreme Court has allowed officers to seize incriminating evidence in plain view during the course of a lawful search because such a seizure "does not involve an intrusion on privacy. If the interest in privacy has been invaded, the violation must have occurred before the object came into plain view." Horton v. California, 496 U.S. 128, 141, 110 S. Ct. 2301, 2310 (1990). In Horton, the Supreme Court set forth three requirements for valid seizures of evidence in plain view. First, the officer must not have violated the Fourth Amendment in "arriving at the place from which the evidence could be plainly

_____

After a conversation with Scott which may or may not have involved some pressure from Scott, Guerriero agreed to allow Scott to copy the documents. JA 882, 826. The district court concluded that, given the totality of the circumstances, Guerriero had consented to the seizure without any governmental coercion. Because we find that the documents were in plain view, we need not reach the question of consent.

viewed." Id. at 136, 110 S. Ct. at 2308. Second, the incriminating character of the evidence must be "immediately apparent." Id. Third, the officer must have "a lawful right of access to the object itself." Id.

We first note that the deliberate decision by the agents to search for Jabeco documents does not in and of itself make the seizure of such documents illegal. The Supreme Court has specifically rejected the requirement, proposed by the plurality in Coolidge v. New Hampshire, 403 U.S. 443, 91 S. Ct. 2022 (1971), that the discovery of the evidence be inadvertent:

> The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement. If the officer has knowledge approaching certainty that the item will be found, we see no reason why he or she would deliberately omit a particular description of the item to be seized from the application for a search warrant.

Id. at 138, 110 S. Ct. at 2309. Nonetheless, even though an officer can keep his or her eye out for particular objects while conducting a lawful search, the Court has made quite clear that the "plain view" doctrine cannot be used to expand the scope of a legal search -- there must be "scrupulous adherence" to the requirement that the search be limited to the time and place necessary to find the items listed on the warrant. Id.

Menon argues that Scott's statement to his agents that he was "interested in documents related to . . . Jabeco" essentially told these agents to search beyond the scope

authorized by the warrant in violation of the first Horton prong. Menon then asserts that Almeida proceeded to do just that when she continued to search Carroll's desk after finding the Abad file. The government responds that Almeida continued the search because she hoped to find more Abad documents and thus found the Jabeco documents in the course of a permissible search.

It is possible that Almeida interpreted Scott's instructions to give her the authority to search for Jabeco documents even after her search for Abad documents was complete. And it is possible that Almeida continued her search of the desk even after she was fairly confident that she had obtained all of the Abad documents. We think, however, that a subjective inquiry into her state of mind is unnecessary. Given the fact that a subjective inquiry would almost certainly yield the same result as an objective inquiry and that "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer," Horton, 496 U.S. at 138, 110 S. Ct. at 2308-09, we hold that a government agent has discovered evidence within the scope of the search allowed by the warrant if the agent's search fits within the literal terms of the warrant and is a reasonable means of obtaining the objects described in the warrant.

Almeida's discovery of the Jabeco documents meets that requirement. Almeida's search fell within the scope of the warrant; the warrant gave the government the authority to search the desk for Abad documents and it was reasonable for Almeida to

continue to do so even after finding the Abad file. Any reasonable agent looking for evidence in a clearly circumscribed area would continue the search until she was certain that no more evidence existed which could not happen until the entire desk was searched.

Menon next argues that it was not immediately apparent that the Jabeco documents constituted evidence of criminality, and hence that the search violated the second Horton prong. This argument divides into two sub-parts. First, Menon avers that it was not immediately apparent to Almeida that the Jabeco documents constituted evidence of criminality. According to Menon, as soon as she saw that the documents were not Abad documents, she should have replaced them rather than bringing them to Scott. She did not, he continues, bring them to Scott because she thought that he might determine they were Abad documents. In Menon's submission, Almeida's movement of the documents constituted an impermissible seizure, and Scott's glance at the documents constituted an impermissible search, i.e. it constituted an invasion of privacy not in any way helpful in conducting the search authorized by the warrant.

We can dismiss Menon's argument that Almeida's movement of the documents constituted a seizure with relative ease, because it did not "meaningfully interfere with [his] possessory interest" in the documents to any extent greater than if Almeida had brought Scott to the documents. See Arizona v. Hicks, 480 U.S. 321, 324; 107 S. Ct. 1149, 1152 (1987). However, Menon's argument that Scott's glance at the documents constituted a new

search which required probable cause is a forceful one given the Supreme Court's emphasis on the particularity of the warrant requirement, the further requirement of immediate apparency, and the goal of preventing officials from enlarging a specific warrant "into the equivalent of a general warrant to rummage and seize at will." Texas v. Brown, 460 U.S. 730, 748, 103 S. Ct. 1535, 1547 (1983) (Stevens, J., concurring).

Menon's contention receives a boost from Hicks, in which the Supreme Court upheld the exclusion of stereo serial numbers obtained by moving some stereo equipment. See 480 U.S. at 325, 107 S. Ct. at 1152-53. The move was not justified by the exigent circumstances which had justified the entrance of officers into the apartment in the first place and hence constituted an invalid search: "[T]aking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy." Id.

This case is potentially distinguishable from Hicks on the ground that movement of the stereo in Hicks revealed to the officers private objects and information that no governmental agent had seen previously; in contrast, Almeida brought documents to Scott at which she had already glanced. Thus, Scott's view of the documents did not constitute either a new search or a new seizure -- Menon had no more privacy interest in the documents after Almeida had glanced at them.

In Hicks, the Court indicated that the movement of the stereo was dispositive; "the mere recording of the serial numbers

[on the stereo] did not constitute a seizure" (emphasis added). See Hicks, 480 U.S. at 324, 107 S. Ct. at 1152. By ruling that the officer's movement of the stereo constituted an illegal search, the Court implied that, just as the mere recording of the serial numbers did not constitute a new seizure, it did not constitute a new search either. This was true even though the police on the scene revealed the serial numbers to outside officers who checked those numbers for information unrelated to the exigent circumstances that had brought the police into the apartment. Indeed, the Court explicitly stated that "a truly cursory inspection -- one that involves merely looking at what is already exposed to view, without disturbing it -- is not a `search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion." See id. at 328, 107 S. Ct. at 1154; cf. United States v. Jacobsen, 466 U.S. 109, 119-23, 104 S. Ct. 1652, 1659-61 (1984) (where Federal Express employees had opened package and seen bags of white powder and then replaced the bags, government removal of these bags did not constitute a new search, since it "enabled the agent to learn nothing that had not previously been learned during the private search"); Illinois v. Andreas, 463 U.S. 765, 771, 103 S. Ct. 3319, 3324 (1983) ("The plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item firsthand, its owner's privacy interest in that item is lost.").

Not only did Almeida's glance at the documents potentially destroy any privacy interest in preventing others from taking a similar look, but it is also important that here,

unlike in Hicks, the officials unquestionably could have legally obtained all of the information they did obtain.  In Hicks, no police officer had legitimate plain view access to the serial numbers on the stereo.  Here, the Jabeco documents came into plain view in the course of a search within the scope of the warrant.  If Scott had searched Carroll's desk himself initially, or had done so after Almeida's search to make sure that she had found all of the Abad documents, he would legitimately have been able to glance at the Jabeco documents as part of his search for Abad documents.

Based on just such potential access by all officials in the house to the discovered materials, many courts have held that government officials other than the one who legitimately discovers materials can look at them (at least if the officials are already in the house).  As the First Circuit explained, the police "may be limited by the shared knowledge and experience of the officers otherwise lawfully on the premises," but "[t]he executing officers are not limited by the fortuity of which officer first happened upon the evidence."  United States v. Johnston, 784 F.2d 416, 420 (1st Cir. 1986).  See Crowder v. Sinyard, 884 F.2d 804, 821 (5th Cir. 1989); United States v. Newton, 788 F.2d 1392, 1395 (8th Cir. 1986); but cf. United States v. Syzmkowiak, 727 F.2d 95, 99 (6th Cir. 1984) (where officer who saw gun in plain view had to call in serial numbers to determine whether possession of the gun was illegal, the incriminating nature of the weapon was not immediately apparent).

Nonetheless, Menon has a strong counter-argument in addition to his reliance on Syzmkowiak, supra. The very reason Almeida brought the documents to Scott is that he was better equipped to understand their contents than she was -- thus, his glance was likely to reveal private information that had not been revealed to Almeida when she glanced at the documents. Imagine for example that the police are conducting a lawful search for cocaine. In the course of his search, an officer sees a document written in French lying face up on a table in plain view. His glance at the document reveals nothing to him about its contents because he does not understand French and he calls over another officer who speaks French. The second officer glances at the document and thereby obtains a cursory understanding of the meaning of the document. This understanding might not reveal information helpful to the police, but it might instead reveal information about the fully legal, private love affairs of the resident of the house. Surely the glance of the second policeman constitutes at least an incremental invasion of privacy beyond that caused by the glance of the first officer.

Quite arguably Almeida caused such an incremental invasion of privacy here by exceeding the scope of the search warrant. Unlike Almeida's actions in continuing to search the desk after finding a file marked "Abad," her actions in bringing the documents to Scott would not seem to be part of a reasonable effort to carry out the search for Abad documents, for it is apparent that her actions led to an additional glance at the document beyond that reasonably needed to fulfill the purpose of

the intitial warrant.  Moreover, the original rationale for the plain view doctrine does not apply under this analysis:  the invasion of privacy involved in Scott's looking at the documents had not already taken place when Almeida brought the documents to him, nor was it certain that it was going to take place.  Scott may well not have conducted a search of the desk himself.  Thus, Almeida's actions were part of an effort to give Scott access to information that he had not been authorized by a search warrant to receive and that he would not inevitably have seen in conducting his own search.

When analyzing an analogous situation to the one here, a leading treatise on search and seizure questions sets forth precisely the type of argument Menon is making.  In evaluating whether a policeman who crosses a room to copy down an exposed stereo serial number after he has already found the gun for which he had a search warrant violates the Fourth Amendment, the treatise notes that:

> [t]rue, it is no search to see `what is already exposed to view,' but . . . the serial number was exposed in an abstract sense but was not exposed to <u>this officer</u> until he crossed the room, an activity on his part which was (to again use the <u>Hicks</u> majority's language) `unrelated to the objectives of the authorized intrusion' and thus not permitted under the Fourth Amendment.  This means that even in those cases where an identifying characteristic is discovered without moving the object, a troublesome scope-of-warrant execution issue may be presented concerning why the officer was within reading distance of the serial number.

Wayne R. LaFave, <u>Search and Seizure</u>, § 4.11 at 105 (2d ed. 1987) (Sup. 1994).

Nonetheless, we decline to hold that Almeida's actions in bringing the documents to Scott were impermissible. Ultimately, we agree with the courts of appeals that have decided that the immediate apparency of criminality should be measured, at a minimum, by the collective knowledge of the officers on the scene.  <u>See</u> <u>supra</u> at 28.  First, we think this holding is supported by the weight of Supreme Court precedent, which suggests that once an object has come into plain view in the course of a legitimate search, any privacy interest in preventing a cursory inspection of that object has been destroyed.  Second, we think that the case law is correct to strike the balance in this way.  The French letter example presents a rare case; in most cases, once one officer has glanced at an object, any private information that can be revealed at a glance, will have been revealed -- except for evidence of illegal activity unprotected by the Fourth Amendment.  <u>See</u> <u>Jacobsen</u>, 466 U.S. at 123-24, 104 S. Ct. at 1661-62 (holding that a test that merely disclosed whether or not a particular substance was cocaine did not compromise any reasonable expectation of privacy and therefore did not constitute a search).  The typical case will be the revelation of serial numbers on a gun which require a database to identify but which reveal no information beyond whether the gun is legal or illegal.

Moreover, if we were to require the officer who came across an object in the course of his or her own permissible

search to understand the relationship of the object to criminality, the police would probably respond by assigning the most knowledgable officers to conduct searches or by having multiple officers search the same area. The invasion of privacy would end up being as great; all that we would have accomplished is that the police search would cost more and be less efficient. Finally, we note that we could hardly prevent the officer who first saw an object from remembering what he or she saw and probably even testifying about it, which means that any additional invasion of privacy from revelation of the information to others is likely to occur anyway. Cf. Jacobsen, 466 U.S. at 119, 104 S. Ct. at 1659 ("Respondents do not dispute that the Government could utilize the Federal Express employees' testimony concerning the contents of the package. If that is the case, it hardly infringed respondents' privacy for the agents to re-examine the contents of the open package.") Thus, we hold that Almeida's actions in bringing the Jabeco documents to Scott did not violate the Fourth Amendment.

Menon then argues that Scott's own glance at the Jabeco documents was too searching to meet the "immediately apparent" requirement. But we have explained, Scott was entitled to glance at the documents to the same extent that Almeida was. Almeida was entitled to look at them carefully enough to determine that they were not blank Abad invoices. See United States v. Santarelli, 778 F.2d 609, 615-16 (11th Cir. 1985) ("Given the fact that the search warrant entitled the agents to search for documents . . ., it is clear that the agents were entitled to

examine each document . . . to determine whether it constituted evidence they were entitled to seize under the warrant."). The district court found that upon his brief glance at the first Jabeco document, Scott noticed the words "Jabeco" and "for reprocessing purposes"; the court also found that these words provided him with probable cause to read the entire document because Scott had strong reason to believe that Flag was illegally importing irradiated food from Jabeco and Scott knew that "reprocessing" was a euphemism for irradiation. We have no reason to hold that these findings were clearly erroneous.

As to the other two Jabeco documents, Scott testified that "the thing that was significant to me was that they were interrelated" to the first document because they all said Jabeco and were all from the same file. The district court found that Scott's interrelationship conclusion was warranted and that this provided him with probable cause to read the two documents carefully. Again, we decline to disturb these findings.

In sum, because 1) the Jabeco documents came into plain view in the course of Almeida's search of the desk; 2) Almeida's search of the desk was reasonable under the terms of the warrant which entitled her to search that desk until she found all of the blank Abad invoices that the desk contained, and 3) in glancing at these documents long enough to determine that they were not blank Abad invoices, it was immediately apparent, using the collective knowledge of the officers on the premises, that the documents were evidence of criminal activity, we hold that the

search and seizure of these documents did not violate the Fourth Amendment.

C. Sufficiency of the Evidence on Count 140

Finally, Menon contends that, even if we affirm the district court's decision to admit all of the evidence found in the search, the government did not adduce sufficient evidence that he "fraudulently or knowingly import[ed] or br[ought] into the United States, any merchandise contrary to law" by reimporting the shrimp that had been rejected by the FDA. He argues that all of the government's evidence on shrimp travelling from Jabeco to the United States relates to shrimp with different specifications (hence different shrimp) from the shrimp initially rejected by the FDA. As a result, importation of this shrimp was not "contrary to law."

The shipment rejected by the FDA consisted of 1,200 cases of shrimp ranging in size from 15/20 per pound to 21/40 per pound, with a total weight of 42,864 pounds. These specifications come from a bill of lading within the file of Sperduto, Spector, & Company ("Sperduto"), the firm Flag had engaged to conduct an annual audit of its books. The bill of lading for the shrimp shipped from Jabeco to the United States, however, indicated there were 696 cases at 11,681 pounds, and the invoice stated that the size of the shrimp was 300/500 per pound (much smaller than the rejected shrimp). Thus, it does appear that the shipment of shrimp sent to the United States was not the same as the one rejected by the FDA. However, the government

argues that the documents related to the shipment from Jabeco to the United States were falsified and that the shipment did in fact consist of the same shrimp. By finding Menon guilty, the jury agreed with the government. The district court denied Menon's motion for judgment of acquittal.

The standard in deciding whether to grant "a post-verdict judgment of acquittal is the same as that which the trial court applied. We must view the evidence in the light most favorable to the jury verdict and presume that the jury properly evaluated credibility of the witnesses, found the facts, and drew rational inferences." United States v. Iafelice, 978 F.2d 92, 94 (3d Cir. 1992) (citation omitted). The court may overturn a guilty verdict only if no reasonable jury could find the defendant guilty beyond a reasonable doubt. See United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987). Although the question is a close one, we think that a reasonable jury could have found Menon guilty beyond a reasonable doubt.

First, the government presented evidence that a Flag employee told its auditor Sperduto that some of the shrimp was the same. Jay Rosner, a CPA who worked for Sperduto on the Flag audit, testified that, while attempting to trace the whereabouts of the 1,200 cases of shrimp, he took notes based on statements made by someone at Flag:

> Flag sent 1,200 cases of shrimp to be IQF'd at Rotterdam . . . [A]ttached is the copy of the bill of lading from the shipment from Flag to Rotterdam. Also attached is the invoice . . . for processing the shrimp and the bill of lading from Rotterdam to New

>York.  696 cases were stored in Union
>Warehouse Terminal on 8/20/91.

Although Rosner testified that no auditor ever verified that the 696 cartons were connected to the 1,200, he made it clear that "[t]hose were Flag's assertions."  JA 457, 475.

Rosner's testimony is backed up by the fact that in Sperduto's files relating to the 1,200 rejected cases of shrimp was a bill of lading and a storage document pertaining to the 696 cases of shrimp.  Joseph Sperduto, another CPA with the Sperduto firm, testified that the reason the documents would be in that file is that the client or the person conducting the audit had provided them and had indicated they were connected.  JA 442-44.

Although this evidence does not explain who at Flag said that the two shipments were related or why the specifications of the two shipments were different, it evidences a connection, especially given that the original source was Flag itself.  Of course, it may be that someone at Flag or at Sperduto simply erred in relating the two shipments,[0] but it was reasonable for the jury to conclude otherwise, at least when this evidence was considered in light of additional government evidence.

---

[0]For example, John Guerriero, the comptroller at Flag who maintained its books and records, indicated that, when asked to provide backup documents to the auditors about the 1,200 cartons of shrimp, he probably took the documents related to the 696 cartons of shrimp from the payment files (A 93), JA 146.  He did not explain why he took these particular documents from the payment files.  Perhaps Guerriero had no explanation and simply made a mistake.

Because Menon knew that Sperduto was attempting to verify the location of the 1,200 cases of shrimp, Menon wrote Jabeco requesting that Jabeco inform Sperduto that it possessed the 1,200 cases of shrimp as of June 30, 1991. Jabeco then wrote Menon and Sperduto acknowledging such possession. The letter continued, "[t]his lot has been shipped back to New York on or about 6th July, 1991 for estimated arrival at New York, July 17th, 1991." While this evidence alone does not definitively prove that Flag directed that the original shrimp be sent back to the United States or that the 1,200 cases actually arrived in the United States, it does tend to prove that the original 1,200 cases of shrimp were shipped back from Jabeco to New York. When this evidence is combined with the fact that Flag connected the 696 cases with the 1,200 cases and the 696 cases actually arrived in New York, it makes it much more likely that the two shipments were actually the same.

Finally, upon receiving his copy of the letter Jabeco had written to Sperduto, Menon crossed out the statement that the shrimp had been sent back to New York and wrote at the bottom of the letter, "Bert! Please omit in second." Menon then sent a fax to Bert Cornelisse at Jabeco which said, "[w]ith regards to the letter you faxed to me, if you have not sent this to Sperduto, Spector & Co., please do not do so until you telephone me." A jury could reasonably conclude that by taking these actions, Menon was attempting to prevent Sperduto from discovering that

the rejected shrimp had been sent back to New York.[0]  Given this evidence of consciousness of guilt and an attempt to cover up that guilt, and the fact that the jury simultaneously found Menon guilty of 137 counts of falsification, the jury might well have resolved the fact that the specifications of the shrimp that arrived in New York differed from those of the shrimp rejected by the FDA by concluding that Menon had falsified the specifications on the shipment to New York.

In sum, viewing the evidence in the light most favorable to the government, see Iafelice, 978 F.2d at 94, we hold that the evidence was sufficient to sustain the verdict on count 140.[0]

---

[0]There are other possible explanations for Menon's letter with respect to the Jabeco letter, but they are far less plausible. For example, Menon may have wanted Jabeco to delete the sentence about re-shipment of the shrimp because these shrimp had not in fact been sent back to the United States and he wanted to ensure the information provided to the auditors was correct. But if this were the explanation, he would have wanted Jabeco to correct the information provided to the auditors even if the original letter had already been sent to them; he would not have told Jabeco to correct the letter only if Jabeco had not yet sent the letter to the auditors.  Moreover, this explanation does not signify a reason why Jabeco would have made a mistake as to the destination of the shrimp.  At all events, the exclamation point in the line "Bert! Please omit in second" conveys a sense of urgency unlikely to have been present had Menon simply desired to correct a mistake.

[0]The defendant presented evidence from an independent warehouseman, Robert McLaughlin, that the shrimp which returned to the United States did not meet the specifications of the shrimp rejected by the FDA.  JA 629-30.  However, the government impeached McLaughlin's testimony by showing that it was based on business records rather than personal knowledge and that it was possible that the specifications on these business records resulted from a transfer of information from the allegedly falsified specifications on the materials accompanying the shrimp to the United States. JA 617, 625, 630.  In viewing the evidence in the light most favorable to the government, we assume that the

IV. THE SENTENCING ISSUES


The district court sentenced Menon under Sentencing Guideline § 2Q2.1.  U.S.S.G. § 2Q2.1 (1992).  Under this section, his base offense level was six.  U.S.S.G. § 2Q2.1(a).  His offense level was increased by two because he had a commercial purpose.  U.S.S.G. § 2Q2.1(b)(2).  It was further increased by fourteen under subsection (b)(3)(A), which provides for an enhancement according to the table in § 2F1.1, "if the market value of the fish, wildlife, or plants exceed[s] $2,000." U.S.S.G. § 2Q2.1(b)(3)(A).

At a minimum, we must remand for resentencing.  The market value of the seafood at issue in Count 140 ($141, 899), although more than $2,000, is far less than the market value of the seafood at issue when the district court sentenced Menon -- which included the value of the seafood in Menon's other 137 counts of conviction.  Thus, the enhancement which would be applicable under the table in § 2F1.1 would no longer be 14 levels.  But Menon contends that the enhancement is not applicable at all, because application of the enhancement violates the Ex Post Facto Clause of the Constitution.  We agree.

Even though such an enhancement was part of the guidelines when Menon was _sentenced_, it was not part of the

---

jury made a reasonable credibility judgment that McLaughlin's testimony was not helpful.

guidelines at the time of Menon's conduct.  The conduct at issue in count 140 occurred in July of 1991 when the sentencing guidelines provided for an upward adjustment only "if the market value of the specially protected fish, wildlife, or plants exceeded $2,000."  See U.S.S.G. § 2Q2.1(b)(3)(a) (1990).  Had Menon been sentenced for reimporting previously rejected shrimp at that time, he would not have been subject to the upward adjustment because shrimp are not "specially protected."  But Menon was sentenced in June 1993, when the guidelines provided for an enhancement if the "market value of the fish, wildlife, or plants exceeded $2,000."  U.S.S.G. § 2Q2.1(b)(3)(A) (1992).

The general rule is that a sentencing court must apply the guidelines in effect at the time of sentencing.  See United States v. Cherry, 10 F.3d 1003, 1014 (3d Cir. 1993); United States v. Kopp, 951 F.2d 521, 526 (3d Cir. 1991); 18 U.S.C. §3553(a)(4); U.S.S.G. § 1B1.11(a)(1993).  But changes in sentencing guidelines that enhance the penalty offend the Ex Post Facto Clause of Article I of the United States Constitution.  See Miller v. Florida, 482 U.S. 421, 431–35, 107 S. Ct. 2446, 2451–54 (1987); Kopp, 951 F.2d at 526.  In Miller, the Supreme Court explained that a retrospective law that disadvantages the offender violates the Ex Post Facto Clause, but that a change in law that "does not alter `substantial personal rights,' but merely changes `modes of procedure which do not affect matters of substance'" does not.  482 U.S. at 430; 107 S. Ct. at 2451. Under this framework, the enhancement utilized here is unconstitutional.

Applying the enhancement in the 1992 guidelines which does not contain the "specially protected" substantially disadvantages Menon retrospectively. Menon had no notice at the time he acted that his punishment would be so steep. The government responds in two ways. First, it contends that application of the 1992 guidelines did not retrospectively harm Menon because the Sentencing Commission intended the guidelines in effect during Menon's conduct to apply to importation of valuable seafood regardless of whether it was specially protected. Second, it contends that the district court actually applied the 1990 guideline and merely interpreted it by reference to the subsequent amendment. For analytical purposes, we conflate these two arguments into the single proposition that the 1989 guidelines, interpreted in light of earlier guidelines and later ones, did in fact provide an enhancement regardless of whether the seafood was "specially protected."

The government defends this proposition by pointing out that prior to 1989 there were two separate enhancement provisions -- one within section 2Q2.1 for specially protected fish wildlife and plants, see U.S.S.G. § 2Q2.1(b)(3)(A) (1988), and one within section 2Q2.2 for fish, wildlife and plants generally, see U.S.S.G. § 2Q2.2(b)(3)(A) (1988). Had Menon's conduct occurred prior to November of 1989, that conduct would have been subject to the enhancement for seafood generally. The Commission intended the 1989 amendment to "consolidate two guidelines that cover very similar offenses," U.S.S.G. § 2Q2.1, app. C, amend. 209 (1989), rather than to make any substantive changes. But in

consolidating sections 2Q2.1 and 2Q2.2, the Sentencing Comission adopted the enhancement provision from § 2Q2.1 which only applied to "specially protected" fish. The Commission explained in 1991, that the language "specially protected" had been "inadvertently retained" when the sections were consolidated. See U.S.S.G. § 2Q2.1, app. C, amend. 407 (1991). Thus, the government argues that the intent of the Commission was always to apply the enhancement to importation of seafood worth more than $2,000, regardless of whether it was specially protected or not.

The government asserts that the 1991 amendment deleting the "specially protected" language combined with its reference to that language as having been "inadvertently retained" in the 1989 consolidation means that the 1991 amendment was merely intended to clarify the meaning of the already exiting guideline. The government points out that when an amendment to a guideline is intended to clarify the meaning of the existing guideline, the court must give it substantial weight in interpreting that guideline. See United States v. Joshua, 976 F.2d 844, 853 (3d Cir. 1992); United States v. Ofchinick, 877 F.2d 251, 257 n.9 (3d Cir. 1989). In fact, the Ninth Circuit relied on precisely such reasoning to hold that "section 2Q2.1(b)(3)(A) was never intended to apply solely to `specially protected' wildlife after its consolidation." United States v. Atkinson, 966 F.2d 1270, 1276 (9th Cir. 1992). But the Ninth Circuit did not reach this conclusion in the context of an ex post facto challenge and, in any case, we disagree.

First, we have never held that a "clarifying" amendment can be used to interpret an earlier guideline when applying the amendment would punish the defendant more harshly than he would have been punished under the court's independent interpretation of the pre-amendment language.  Second, the amendment here was not a clarification.  It indicated that the language "specially protected" had been inadvertently retained when the guidelines were amended in 1989; it did not state that the 1989 guideline applied to seafood that was not "specially protected."  Third,

> [w]here the Commission adopts an interpretive commentary amendment that the text of the guideline cannot reasonably support, the Commission circumvents the process Congress has established for amending the guidelines. When this happens, we should decline to follow its lead.

Joshua, 976 F.2d at 854.  No interpretive amendment can excise key words ("specially protected") from a guideline.  And no individual who read the guidelines before 1989 while contemplating his likely fate if he imported valuable shrimp would have understood that he was subject to an enhanced sentence under the guidelines.  Thus, when resentencing Menon for reimporting previously rejected shrimp, the district court cannot apply the enhancement for importation of seafood worth more than $2,000.

V. CONCLUSION

For the foregoing reasons, we will reverse Menon's convictions on Counts 1 through 15, 17 through 32, and 34 through 139.  We will affirm Menon's conviction on Count 140, and remand the case to the district court for resentencing on that Count under the 1990 guidelines.