**UNITED STATES of America, Appellee,**

v.

**Angelo Valentino GARCES,
a/k/a Lolo, Appellant.**

**No. 97–3073.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 20, 1997.

Decided Jan. 20, 1998.

Jonathan Zucker, Washington, DC, appointed by the court, argued the cause and filed the briefs for appellant.

Pamela S. Satterfield, Assistant U.S. Attorney, Washington, DC, argued the cause for appellee. With her on the brief were Mary Lou Leary, U.S. Attorney, John R. Fisher, Thomas C. Black, and Brenda Baldwin–White, Assistant U.S. Attorneys.

Before: WALD, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Concurring opinion filed by Circuit Judge RANDOLPH.

STEPHEN F. WILLIAMS, Circuit Judge:

Angelo Valentino Garces was convicted of violating 18 U.S.C. § 922(g)(1), which makes it a crime for a convicted felon to possess a gun and ammunition. In this appeal he challenges the admission of a car key and related testimony. Officers found the key in a pair of pants during a search of Garces's residence pursuant to a lawful warrant and used it to open a green and white Cadillac parked outside the residence and owned by Garces's aunt. In the car, which they searched with the aunt's express written consent, they found the gun and ammunition giving rise to the charge. At trial the government offered the key (among other things) to link Garces to the contraband.

The key was not among the items described in the warrant. And its seizure did not fall within the "plain view" exception to the Fourth Amendment's warrant requirement, says Garces, because the officers lacked probable cause to think it evidence of a crime until *after* they had searched the car. Thus, he says, seizure of the key was illegal.

Because the only reasonable reading of the aunt's consent to search the car is that it included consent to use the key, we affirm.

\*   \*   \*

On July 24, 1996 officers of the FBI and Washington Metropolitan Police Department went to Garces's house with a warrant for his arrest for the murder of Thomas Johnson, and a warrant for search of the premises. The warrant permitted them to search for and seize various items that they had probable cause to believe were evidence or instrumentalities of the murder:

> an auto-loading pistol and ammunition, a black mask, a dark colored rain slicker and documentation (mail, telephone bills, news clippings) demonstrating connections between Mr. Garces and decedent, Johnson, which is [sic] evidence of the crime of murder.

The police entered Garces's home and found him sleeping on the couch. Though he initially gave a false name, Garces identified himself when confronted by an officer who knew him; the officers arrested him and removed him from the premises. The police then conducted the search. Two officers, FBI Agent Bamel and another, went to the basement, where they found a pair of camouflage pants neatly folded on a chair. They searched the pockets of the pants and found an identity card belonging to Garces and a key on a nylon key chain, together with a photo of a young girl who turned out to be Garces's daughter. The photograph of the key in the record gives it the appearance of a car key, apparently to a General Motors car though not necessarily a Cadillac. Agent Bamel took the key and key chain and went upstairs and gave them to the "seizing officer," Agent Bedford, who in turn gave the

key to Agent Buckley. Meanwhile, upstairs the police found a green camouflage rain coat and a black mask in the coat pocket, which they seized.

During the search the officers noticed a green 1970 Cadillac with a white roof parked outside. (Tr. 1/6/97, p. 35.) The officers phoned to find out who owned the car, and found it registered in the name of a Sophia Garces, shown in the registration as living at the same residence. Sophia Garces, appellant's aunt, was in fact on hand. Agent Buckley asked for her consent to search the car. She gave express written consent to a search, and also told the officers that Angelo Garces, known to her as Lolo, sometimes drove the car. (Tr. 1/6/97, pp. 64–66.) The validity of Sophia Garces's consent is not challenged here.

Agent Buckley turned the key over to Detective Rivera to use in searching the car. Rivera opened the car and in the glove compartment found some papers with Garces's name on them, and several cellular phones; more to the point, he noticed a .45 caliber Colt semi-automatic pistol under the front passenger seat. Rivera attempted to look in the trunk but could not, since it was locked and could not be opened even with the key from the pants. He left the items in the car and then asked Sophia Garces whether there was another key or set of keys for the car, to which she responded no. (Tr. 3/12/97, p. 143.) The police then decided to have the car towed to an FBI lot until they could get a warrant to search it. When the warrant for the car was executed, the FBI seized the gun from under the seat and various documents from the glove compartment, some of which had Garces's prints.

At the suppression hearing Garces focused on a claim that the car search was illegal. But nested within that contention was a claim that the seizure of the key itself was illegal; that illegality supposedly invalidated the aunt's consent to the car search. (Tr. 3/7/97, pp. 21–23.) As to the key, he argued first that it fell outside the scope of the search warrant, and furthermore that it was outside the "plain view" exception to the warrant requirement because its incriminating nature was not "immediately apparent."

*Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). See also *Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987) (specifying that under the plain view doctrine the officers must have probable cause to believe that the item is incriminating). Here he no longer claims that illegalities in the key's seizure undermined the aunt's consent, only that the seizure of the key itself, and thus its later admission, were invalid.

The government also focused on the car search during the suppression hearing. In response to Garces's claims about the key, the government appeared to assert that the key's incriminating nature was "immediately apparent," but the government never clearly explained why this was so. It referred to evidence that the officers knew Garces used the Cadillac when he made an illegal threat to potential witnesses. In fact, though, the only knowledge of Garces's car use shown by the testimony at the suppression hearing was knowledge (acquired by the officers from Sophia Garces) that he drove it, so far as appeared, for innocent purposes. The judge ruled from the bench that the officers' use of the key in searching the car was reasonable, given the link between Garces and the car. "[I]f there had been no key they could in due course have obtained one, and it also appears that they could have opened the car without a key, or they could have called a locksmith to make one. The consent not the key was the key to the solution." (Tr. 3/7/97, p. 25.) Implicitly, the judge seems also to have regarded as reasonable the seizure of the key and its introduction as evidence, for the same reason.

At trial the key acquired a greater significance than the passing attention given to it in the suppression hearing might have suggested. During its deliberations the jury sent back to the judge a query asking whether "if someone has ... sole control of the only key of the car, does that person have constructive possession of everything in the car?" (Tr. 3/14/97 (a.m.), p. 2.) With both counsels' consent, the judge declined to answer; the jury convicted.

\*     \*     \*

The first question is whether the key can in fact be deemed "seized" during the time between its discovery in the basement and the gun-revealing search of the Cadillac.[1] Here we divide the process into two periods: the carrying of the key from the basement up to the "seizing officer," and then its use outside the house to open the car. The first was not a seizure. In *Arizona v. Hicks,* where officers who had entered an apartment because of exigent circumstances moved a stereo set enough to be able to read its serial numbers, the Court found no seizure (beyond that covered by their exigent circumstances entry), on the ground that merely moving the equipment around enough to spot the serial numbers did not subject the defendant's "possessory interest" to any "meaningful interference" beyond that occasioned by the warranted search itself, 480 U.S. at 324–25, 107 S.Ct. at 1152–53. See also *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984); *Soldal v. Cook County,* 506 U.S. 56, 61, 113 S.Ct. 538, 543, 121 L.Ed.2d 450 (1992).[2] Similarly, in *United States v. Menon,* 24 F.3d 550, 560–61 (3d Cir.1994), the court found no seizure in a searching officer's carrying a document from where he found it to a more knowledgeable officer in the next room, because moving the document did not meaningfully interfere with the defendant's possessory interest in it any more than if the more knowledgeable officer had been brought to the document.

Although Garces's brief framed his argument about the movement of the key as a case of unlawful seizure, at oral argument he seemed to pursue the theory that it was a new search. He invoked *Hicks*'s finding that the officers' movement of the stereo equipment initiated a new search because it exposed serial numbers not otherwise accessible, and thus "produce[d] a new invasion of respondent's privacy unjustified by the exigent circumstances." 480 U.S. at 325, 107 S.Ct. at 1152. But *Menon* rejected an attempt by the defendant to extend *Hicks,* similar to what Garces may be claiming here. Menon argued that the more knowledgeable officer's review of the documents constituted a new search because his more complete understanding of the case's background enabled him to spot incriminating aspects of the papers imperceptible to the first officer. The Third Circuit denied the defendant's claim, relying on the concept of collective knowledge: in determining whether officers have probable cause to believe an item qualifies as evidence, the court must look to the aggregate knowledge of the searching officers. More pragmatically, the court reasoned that a contrary ruling would just force law officers to have the most informed officer do all the searching. 24 F.3d at 561–63. We agree. Thus, assuming any variation in the scope of the various officers' knowledge, we find neither search nor seizure in their carrying the key about the house to determine its evidentiary value.

As for the use of the key outside the house to open the Cadillac, we find it unnecessary to address whether this action represented a seizure. A warrantless seizure may be validated by the consent of someone with authority over the property, *United States v. Matlock,* 415 U.S. 164, 170–71, 94 S.Ct. 988, 992–93, 39 L.Ed.2d 242 (1974), and, as we explain below, Sophia Garces supplied that consent.

Sophia Garces not only gave consent to the search of her car, but at the same time said that Angelo drove it. From Ms. Garces's statements that she owned the car driven by Angelo, the officers could reasonably have inferred: (1) that as the car's owner, Sophia Garces was the owner of a key

---

1. The search of the pants pockets was plainly legitimate, since items named in the search warrant, ammunition and documents, could easily have fitted inside the pants pockets. See, e.g., *United States v. Jenkins,* 901 F.2d 1075, 1082 (11th Cir.1990); *United States v. Martinez–Zayas,* 857 F.2d 122, 133 (3d Cir.1988).

2. Actually, the Court in *Hicks* said only that "the mere recording of the serial numbers did not constitute a seizure," 480 U.S. at 324, 107 S.Ct. at 1152, which leaves open the possibility that the separate moving of the equipment, which constituted a search, also constituted a seizure. But Justice Powell's dissent, *id.* at 332, 107 S.Ct. at 1156, confirms a reading of the majority's opinion that the movement of the equipment was a Fourth Amendment search but not a seizure.

which the police had found in Angelo's pants and which they reasonably thought would fit her car; (2) that as the car's and key's owner, Ms. Garces was legally capable of authorizing the police to use the key to search the car; and (3) that her consent to search the car in fact exercised that authority. Since Ms. Garces was the sole registered owner of the car, it was a fair inference that she would be the owner of any keys that opened it. One can, of course, imagine scenarios under which she might have given her nephew more than mere possession, e.g., some "estate for years" in the key (which simply means an estate for a fixed period of time), see Restatement (First) of Property § 19 cmt. a (1936), but in judging what is reasonable officers can expect property relationships to be the normal or customary ones, not the unusual or outré, at least until they are presented with contrary information. See *United States v. Jenkins*, 92 F.3d 430, 437 (6th Cir.1996). On the natural assumption that Sophia Garces was simply allowing Angelo the use of her car, she would normally have the power to revoke her consent to his possession of the key. We may assume, without deciding, that she could not herself have lawfully burrowed into his trouser pockets in order to effect a transfer of possession to the officers. But no such burrowing was necessary; the officers had already lawfully secured possession of the key.

Finally, a reasonable reading of Sophia Garces's grant of consent was that she implicitly exercised her power to authorize use of the key to facilitate the search. Common sense strongly supports that inference. While the officers could have effected the car search by jimmying the lock or securing the aid of a locksmith, that course offered her no advantage. It would have carried some risk of injury to the car, and it would have extended the period in which her own access to the car was suspended. Thus, although we assume that Garces had a sufficient possessory interest in the key to entitle him to raise the Fourth Amendment issue, see *Soldal*, 506 U.S. at 61–62, 113 S.Ct. at 543–44, the seizure (if any) was reasonable because authorized by a party with apparently superior title.

◼ Although Sophia Garces's consent legitimated the use of the key to open the car, there is, of course, no reason to suppose that it legitimated the officers' carrying away of the key after the car search. (We assume arguendo that the carrying away at that time played a causal role in the key's availability for use at trial.) We conclude, however, that the carrying away was lawful because, once the key was used to open the car, its incriminating nature was "immediately apparent." *Coolidge*, 403 U.S. at 466, 91 S.Ct. at 2038.

◼ If the plain view doctrine's immediate apparency requirement were taken literally, it would mean that unless searching officers had probable cause to grasp the incriminating character of an item not specifically covered by a search warrant *at the precise moment they first spotted it*, its seizure would become unlawful for the duration of the search, regardless of information lawfully acquired later in the search. Such an approach would condition the lawfulness of a seizure on the fortuity of whether the item was discovered early or late in the search: if officers entered premises under a warrant, and first saw a kitchen knife and then a corpse with its throat slit, they could not take the knife; but they could if the sequence were reversed. Thus, although the phrase "immediately apparent" sounds temporal, its true meaning must be that the incriminating nature of the item must have become apparent, in the course of the search, without the benefit of information from any unlawful search or seizure.[3]

Cases interpreting the immediate apparency requirement of the plain-view doctrine are few and mixed. *Menon*, discussed earlier, clearly takes the view that in assessing compliance with the "immediately apparent" cri-

---

**3.** Such unlawful search might, of course, include search of the object itself. See *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 2137, 124 L.Ed.2d 334 (1993) ("If ... the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object ... the plain-view doctrine cannot justify its seizure."). But any subsequent legitimate steps in the search process are as effective as prior steps in supplying the requisite knowledge.

terion, postdiscovery steps needed to establish the papers' incriminating character "count" so long as they themselves are legitimate. 24 F.3d at 560–63. The First Circuit has described the onset of probable cause in the plain-view context as a cumulative process, using the metaphor of a light bulb: "The sum total of the searchers' knowledge must be sufficient to turn on the bulb; if the light does not shine *during the currency of the search,* there is no 'immediate awareness' of the incriminating nature of the object." *United States v. Rutkowski,* 877 F.2d 139, 142 (1st Cir.1989) (emphasis added). And just last month the Fourth Circuit held that the plain-view doctrine validated a seizure of drug paraphernalia, despite the fact that the searching officer did not recognize the incriminating nature of the paraphernalia until he had left the room and returned to view it a second time. *United States v. Jackson,* 131 F.3d at 1106–07, 1109–10 (4th Cir.1997).

On the other hand, the Sixth Circuit has enunciated the doctrine that the officers must have probable cause to believe the item incriminating "at the time of discovery." See, e.g., *United States v. Szymkowiak,* 727 F.2d 95, 98 (6th Cir.1984); *United States v. Beal,* 810 F.2d 574, 577 (6th Cir.1987). The latter case, however, is quite reconcilable with our view. Officers discovered fountain pens that they suspected were in truth guns and seized them; only later, after disassembly and lab analysis, did they raise their knowledge from mere suspicion over the probable cause threshold. *Id.* at 576. *Szymkowiak* explains that the purpose of the temporal immediacy rule is to "obviate prolonged, warrantless rummaging." 727 F.2d at 98. But as long as any "rummaging" must be lawful for its yield to qualify (as under our view), it is unclear how the *Szymkowiak* rule provides any additional deterrence to prevent officers from unlawful invasions of privacy or possessory interests. Just as searching officers "are not limited by the fortuity of which officer first happened upon the evidence," *Menon,* 24 F.3d at 561–62, we believe they should not be limited by the fortuity of which piece of evidence they happen upon first.

Our reasoning here may differ in detail from that of the trial court and from the theories pressed by the government, and we are mindful of the resulting risk of prejudice to the defendant, see *United States v. Dawkins,* 17 F.3d 399, 408 (D.C.Cir.1994) (citing *Giordenello v. United States,* 357 U.S. 480, 488, 78 S.Ct. 1245, 1251, 2 L.Ed.2d 1503 (1958)). But, as we observed before, at the suppression hearing the defendant did not focus attention on the admissibility of the key. The lawfulness of the seizure of the key was indeed at issue, but mainly as part of the challenge to the car search. Thus the district court's aphoristic disposition of the issue ("The consent not the key was the key to the solution") was a completely understandable telescoping of issues presented by the defendant. If defendant had been troubled by the ambiguity as to whether the finding of consent encompassed use of the key, the burden was on him to demand clarification. *United States v. Mitchell,* 951 F.2d 1291, 1299 (D.C.Cir.1991); *United States v. Caballero,* 936 F.2d 1292, 1296 (D.C.Cir. 1991).

\* \* \*

■ Garces raises two evidentiary points. He moved *in limine* to exclude evidence of threats made by him with a gun that looked like the weapon found in the Cadillac. The court ruled that the victims of these threats could testify to seeing Garces six days before the seizure and could describe the weapon he had in hand, but that they could not speak of the threats. At trial things did not work out exactly as intended. The threat victims blurted out the threats, saying that Garces had said he was "going to shoot" them. (Tr. 3/10/97, pp. 78, 149.)

While Rule 404(b) of the Federal Rules of Evidence generally excludes evidence of "other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith," it permits such evidence for such purposes as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Appellant does not appear to claim here, however, that the threat testimony was inadmissible under Rule 404(b), but only that in admitting it the trial court

abused its discretion under Rule 403, because of its unduly prejudicial effects. The "emotionally compelling" nature of the "death threats" testimony was by itself enough to overwhelm deliberative consideration of the "abstract," colorless charge of constructive possession of a firearm.

■ The judge was clearly aware of the potentially prejudicial nature of the witnesses' references to the threats, and indeed ruled them out. They were not directly elicited by the prosecutor's questions, and there is no indication in the record that the prosecutor encouraged the lapse. Indeed, one of the blurtings occurred in response to a question by defense counsel on cross-examination. (Tr. 3/10/97, p. 113.) The judge took reasonable precautions to minimize the risk of any misuse, instructing the jury that the threat incident testimony was admitted only "for the limited purpose of aiding you to decide whether the defendant possessed the gun recovered by the police...." (Tr. 3/13/97, p. 64.) He went on to caution them that they may not consider the testimony about the threats "as evidence that the defendant had a bad character or that the defendant has a criminal personality." *Id.* Accordingly, we find no abuse of discretion in letting the jury, properly instructed, proceed to judgment. Furthermore, any possible prejudice from the references to the threats was well within the threshold of harmless error, given the overwhelming strength of the case against Garces.

■ Garces also sought protection from being linked to the Thomas Johnson murder for which the arrest warrant was issued. The court ruled that the government could introduce evidence of the warrant, execution of which had led to seizure of the car and its contraband, as part of the explanatory background, but said that the government witnesses must not refer to the warrant's being for the crime of murder. At trial, though the murder charge was not specifically mentioned, some witnesses referred to "homicide" investigators. Garces argues that even the reference to the arrest warrant was a violation of Rule 404(b), on the theory that the search warrant alone adequately explained the officers' appearance at Garces's house, while the homicide references improperly linked him to a murder investigation.

Although the search warrant would have explained the officers' presence in Garces's home on July 24, it would not have explained what happened on their finding him there— his arrest. Yet that was part of the story explaining the links among Garces, the key and the car. So we reject Garces's 404(b) argument. That the investigators' homicide specialty came out produced some but by no means all of the taint that would flow from mention of arrest for murder; jurors would reasonably suppose that homicide investigators must sometimes arrest for lesser crimes. Thus we find no abuse of the court's discretion under Rule 403 to balance probative value against prejudicial effect.

The judgment of conviction is

*Affirmed.*

RANDOLPH, Circuit Judge, concurring:

It should have been simple enough to explain why the officers' seizure of the car key complied with the Fourth Amendment. Sophia Garces' consent to the search of her car carried with it her consent to using the key to open the car door. *See Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). The officers had already lawfully discovered the key in the defendant's clothing during the search authorized by the warrant. When the officers opened the car with the key, they found a gun. Upon completing their search of the car, they relocked the door, had the car towed to an FBI lot, and seized the key.

It does not take any intricate analysis to conclude that in addition to towing the car away, the officers could take the key as well. They could lawfully seize both items for the same reason: the car and the key were plainly evidence of defendant's criminal activity. *Warden v. Hayden,* 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967), is directly on point. As the Court put it in *Soldal v. Cook County,* 506 U.S. 56, 65–66, 113 S.Ct. 538, 545–46, 121 L.Ed.2d 450 (1992), a plain view seizure is valid so long as the probable cause standard is met—it was here—and so long as the seizure is "unac-

companied by unlawful trespass"—which it was in view of Sophia Garces' consent to the search. Other decisions sustaining seizures of the sort we have in this case are cited in 3 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 8.1(c), at 623–24 (3d ed.1996).

The majority gets itself into an unnecessary tangle by supposing that the validity of the *seizure* of the key rests on "the consent of someone with authority over the property, *United States v. Matlock,* 415 U.S. 164, 170–71 [94 S.Ct. 988, 992–93, 39 L.Ed.2d 242] (1974)." *Maj. op.* at 74. In the first place, *Matlock* dealt only with the validity of a search not a seizure. In the second place, the legality of the seizure of the key (or the car for that matter) rested on the principles explained in *Soldal,* not on Sophia Garces' consent. Her permission enabled the officers to look for evidence of criminal activity without getting a warrant, but once they discovered such evidence, they did not need her consent to seize it.

One other point is worth mentioning. I entirely agree that the officers had not seized the key within the meaning of the Fourth Amendment during their search of the premises, even though they had removed it from its original location. It is true that the Supreme Court has defined a Fourth Amendment seizure as a "meaningful interference" with an individual's possessory interests. *E.g., United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). But I do not believe the Court meant this test to apply while a lawful search is ongoing. Whenever federal officers conduct a search of premises pursuant to a warrant, there is "a meaningful interference with" everyone's "possessory interests" in everything in the line of the search. Those present must stand aside. Until the search has ended, they cannot grab things, proclaim "these are mine," and walk away with the objects. If they tried anything of the sort, they could be prosecuted. *See* 18 U.S.C. § 2231. The "meaningful interference" test should be applied only after the search has ended and the officers have taken property away or have "secured" the premises from entry. This of course means that the key was not seized until after the officers used it to open the car door, at which point its evidentiary value was plain.