**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Mark Strafford ROBINSON,
Defendant–Appellant.**

No. 96–50573.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1997.

Decided June 4, 1998.

Eugene G. Iredale, San Diego, California, for the defendant-appellant.

William Q. Hayes and Timothy D. Coughlin, Assistant United States Attorneys, San Diego, California, for the plaintiff-appellee.

Before: PREGERSON, D.W. NELSON, and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

Mark Robinson appeals his jury conviction and sentence for conspiracy, smuggling goods into the United States, laundering of monetary instruments, engaging in monetary transactions in property derived from specified unlawful activity, and mail fraud in violation of 18 U.S.C. §§ 371, 545, 1956, 1957 and 1341. Robinson's conviction arose out of the international sale and transfer of IBM processor boards. We affirm.

## FACTS AND PRIOR PROCEEDINGS

Mark Robinson ("Robinson") and Bradley Hirou ("Hirou") were co-owners of Fusion International Trading, Inc. ("Fusion"). Robinson was President, majority owner, and had final decisionmaking authority on all Fusion financial matters.

In 1990, Hirou contacted Stephen Pecqueraux ("Pecqueraux"), the majority owner of High Tech Trading ("HTT"), a company located in Paris, France that bought and sold used IBM AS–400 processor and feature cards.[1]

After Hirou determined that Fusion would be able to sell HTT's IBM processor cards, Robinson and Pecqueraux agreed that Fusion would purchase three processor cards from HTT. In June 1990, Robinson traveled to Paris where he obtained the three processor cards from Pecqueraux, put them in his suitcase and brought them to San Diego, California without declaring them to United States Customs.

That same month, Fusion bought fourteen additional cards from HTT for approximately $500,000. Robinson again traveled to Paris to obtain the cards from Pecqueraux. Robinson and Pecqueraux hid the fourteen cards in the back of a computer, thereby avoiding the payment of French taxes by Pecqueraux and the payment of United States customs by Robinson.

Robinson and Pecqueraux agreed that Robinson would pay Pecqueraux via a Swiss bank account so that both could avoid paying taxes to their respective countries, and so that Robinson could avoid paying customs duties on the value of the cards. They traveled to Zurich, Switzerland and each set up a foreign corporation to be used in the creation of false invoices.

The next month, Pecqueraux contacted the president of CSC Computer Sales and Leasing, Inc. ("CSC"), a New York business, and arranged to export the cards from France to the United States by using CSC's import license. CSC acted as the importer of record for the parts sold by HTT to Fusion and also acted as an intermediary by purporting to buy the cards from HTT and then sell them to Fusion, when in fact HTT sold the cards directly to Fusion. HTT sent invoices to CSC understating the value of the computer cards, thereby avoiding duties assessed by United States Customs. No duty was ever charged on any Fusion import on which CSC acted as the importer of record. Moreover, the fourteen IBM cards hidden in the back of a computer were not listed on any invoice presented to United States Customs.

The fourteen cards were sold by Fusion to Sun Data, an Atlanta, Georgia company, for approximately $623,000. Fusion wired payment for the cards to Pecqueraux's Swiss bank account after receiving payment from Sun Data.

Next, Fusion purchased 43 cards from Pecqueraux for $1,360,000. The invoice between Fusion and CSC listed the sale price at $10,000, and the invoice between HTT and CSC listed the sale price at $9,000. The cards were ultimately sold to Sun Data for $1.6 million. After receiving this payment, Fusion wired its payment for the cards to Pecqueraux's Swiss bank account.

A few months later, Pecqueraux sold 554 additional IBM cards to Fusion; the purchase price was $1.8 million. HTT again created a false invoice for CSC that purported that the 554 cards had been sold to CSC for $27,000. CSC created an invoice representing that CSC sold the cards to Arondol (Robinson and Hirou's foreign company, based in Ireland) for $30,500. Arondol was used to make it appear that money sent to Arondol was for expenses, when in fact the money was transferred to Robinson's and Hirou's account. In this way, Robinson and Hirou evaded taxes. Robinson and Hirou sold 423 additional cards to Sun Data for $2.1 million. They then wire transferred $2.3 million to their Swiss bank account.

During this time, Robinson and Hirou bought Pecqueraux a Porsche automobile ($72,356) and a home in Rancho Santa Fe, California ($1.3 million) as payment for computer cards. Soon thereafter, the market for AS–400 cards began to decline.

Robinson appeals from his judgment in the district court after his conviction for violating 18 U.S.C. § 371 (conspiracy); 18 U.S.C. § 545 (smuggling goods into the United States); 18 U.S.C. § 1956(a)(2)(B)(i) (laundering of monetary instruments); 18 U.S.C. § 1957 (engaging in monetary transactions in

---

1. Processor cards determine the processing capability of computers and feature cards perform routine computer functions. Processor cards for AS–400 computers sold for $19,000 to $229,000.

property derived from specified unlawful activity); and 18 U.S.C. § 1341 (mail fraud).

Robinson argues that the district court erred in refusing to instruct the jury that the "intent to defraud" element of 18 U.S.C. § 545 requires the government to prove an intent to deprive the government of revenue.[2]

## ANALYSIS

■ We review a district court's denial of a defendant's proposed jury instruction on a question of law de novo. *See United States v. Duran,* 59 F.3d 938, 941 (9th Cir.1995).

Counts 2, 3 and 4 of the indictment charged Robinson with violating 18 U.S.C. § 545, which prohibits, *inter alia,* the submission of false, forged or fraudulent invoices.[3]

This offense requires the government to prove that Robinson acted knowingly and willfully with "intent to defraud the United States." The jury was instructed that "intent to defraud" meant an "intent to deceive or cheat."

The jury instruction that "intent to defraud" means an intent to deceive or cheat is correct under this court's holding in *United States v. Boggus,* 411 F.2d 110 (9th Cir.1969). In *Boggus,* this court stated that the "intent to defraud" element of 18 U.S.C. § 545 means an "intent to avoid and defeat the United States Customs laws." *Id.* at 113.

Robinson relies on *United States v. Menon,* 24 F.3d 550 (3d Cir.1994), which held that "intent to defraud" means an intent to deprive the government of revenue. The *Menon* court reasoned that because a predecessor statute required that the defendant intended to deprive the government of revenues, and because Congress "did not intend to make any substantive change in the statute by" deleting the reference to revenue, the current statute must also require that the

defendant have intended to deprive the government of revenue:

> At a minimum, we think that the legislative history makes the meaning of "defraud the United States" in § 545 ambiguous given that ... the meaning of defraud varies from statute to statute. As the [Supreme] Court did in *McNally [v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) ], we rely on the rule of lenity to hold that because the meaning of defraud is ambiguous in the context of § 545, that section requires an intent to cause a deprivation of money or property.

*Id.* at 557.

■ *Menon* acknowledged, however, that "the meaning of 'defraud the United States' generally extends beyond defrauding the government of revenue." *Id.* at 555. The Supreme Court has stated that a statute that has as its " 'object the protection and welfare of the government alone' " aims to protect governmental interests extending beyond property rights, whereas a statute that prevents fraud against the public aims to protect property interests. *McNally,* 483 U.S. at 359 n. 8, 107 S.Ct. 2875 (quoting *Curley v. United States,* 130 F. 1, 7 (1st Cir.1904)). The statute at issue, 18 U.S.C. § 545, has as its primary object the protection of governmental interests and accordingly protects governmental interests extending beyond mere property rights. Thus, the intent to defraud element of that statute should be construed as meaning intent to avoid and defeat the United States customs laws, as construed in *Boggus,* rather than the narrower construction "intent to deprive the United States of revenue."

Our decision is in accord with holdings of two of our sister circuits. As the Seventh Circuit explained in *United States v. Kurfess,* 426 F.2d 1017 (7th Cir.1970):

> [T]he 1954 amendment to 18 U.S.C. § 545, which deleted the word "revenue" from

---

2. We address the remainder of Robinson's arguments in a Memorandum disposition filed simultaneously with this opinion.

3. The statute punishes:
   Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper....

"intent to defraud the revenue of the United States" indicated that the primary Congressional purpose behind the Act was not to raise revenue but to supervise and regulate the inflow of imported goods. [Thus,] in light of the Act's purpose [, it is] no longer necessary to show that the item or items introduced clandestinely into the United States were subject to duty in order to prove a violation of the Act.

*Id.* at 1019; *see United States v. Borello,* 766 F.2d 46, 51 (2d Cir.1985) (rejecting the argument that § 545 should be given the same meaning as earlier versions of the statute, "which required a showing the defendant had the 'intent to defraud the revenue of the United States'"); *United States v. McKee,* 220 F.2d 266, 269 (2d Cir.1955) ("[L]oss of revenue need no longer be proven by the government.").

We agree with the Second and Seventh Circuits' conclusion that the deletion of "revenue" in 18 U.S.C. § 545 necessitates reading the statute differently than earlier versions, and that "intent to defraud" in 18 U.S.C. § 545 does not mean "intent to deprive the government of revenue." We therefore reiterate our conclusion in *Boggus* that "intent to defraud" in § 545 means an "intent to avoid or defeat the United States Customs laws."

We conclude that, the district court did not err in refusing to instruct the jury that the government was required to prove intent to deprive the government of revenue under 18 U.S.C. § 545.

AFFIRMED.