**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

SHAKEEL AHMAD,
Claimant-Appellee,

and

$167,558.l86IN U.S. CURRENCY
SEIZED FROM THE FIRST VIRGINIA
BANK, ACCOUNT 90690044;
$3,718.02IN U.S. CURRENCY
SEIZED FROM THE FIRST VIRGINIA
BANK, ACCOUNT 93905491; $711.64
IN U.S. CURRENCY SEIZED  FROM FIRST

VIRGINIA BANK ACCOUNT 90690095;
$8,296.90IN U.S. CURRENCY
SEIZED ON 10/25/93, FROM THE
PERSONS OF SHAKEEL AHMAD AND
ZAMIR AHMED; $5,000 POSTED IN
1993 WITH THE INTERNAL REVENUE
SERVICE AS A COST BOND WITH
RESPECT TO ADMINISTRATIVE
FORFEITURE PROCEEDINGS
AGAINST THE MONIES SEIZED FROM
CERTAIN FIRST VIRGINIA BANK
ACCOUNTS; $1,302 POSTED IN 1993
WITH THE CUSTOMS SERVICE AS
COST BOND WITH RESPECT TO

No. 98-1467

ADMINISTRATIVE FORFEITURE
PROCEEDINGS AGAINST MONIES
SEIZED FROM SHAKEEL AHMAD AND
ZAMIR AHMED; ZAMIR AHMED; MIAN
AHMED,

Defendants,

v.

FIRST VIRGINIA BANK,
Third Party Defendant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-96-1633-A)

Argued: February 28, 2000

Decided: May 25, 2000

Before NIEMEYER, WILLIAMS, and MOTZ, Circuit Judges.

_____

Reversed by published opinion. Judge Motz wrote the opinion, in
which Judge Niemeyer and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Gordon Dean Kromberg, Assistant United States Attor-
ney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria,
Virginia, for Appellant. Michael Stefan Nachmanoff, COHEN, GET-
TINGS & DUNHAM, P.C., Arlington, Virginia, for Appellee. **ON
BRIEF:** Helen F. Fahey, United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant.

Frank W. Dunham, Jr., COHEN, GETTINGS & DUNHAM, P.C., Arlington, Virginia, for Appellee.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

In this in rem civil action the government appeals an order denying forfeiture of the defendant funds. The government contends that some of the funds were used to structure financial transactions in violation of 31 U.S.C. § 5324 (1994), and that the remainder constitutes a substitute for property involved in customs fraud in violation of 18 U.S.C. § 545 (1994). The district court ruled that neither statute provided a basis for forfeiture of the defendant funds and that, in any event, the forfeiture would be a constitutionally excessive fine. We reverse.

I.

This civil action follows certain related criminal proceedings, which derived from a complex operation involving transfers of currency to individuals in Pakistan and the importation of surgical equipment from Pakistani manufacturers. We set forth the details of this operation in United States v. Ismail, 97 F.3d 50, 52-54 (4th Cir. 1996). We restate only the most relevant facts here.

Shakeel Ahmad operated a money exchange business that primarily served Pakistanis living in the United States who wanted to transfer funds back to their families in Pakistan. Ahmad deposited the funds into checking accounts held at First Virginia Bank. Following a conversation with a bank officer on September 25, 1989, Ahmad structured all of his cash deposits in amounts less than $10,000 in order to avoid the filing of currency transaction reports. From January 1, 1990 to October 25, 1993, Ahmad deposited $5.6 million in cash, cashier's checks, and wire transfers into his First Virginia Bank accounts.

In order to obtain a better exchange rate under Pakistani trade regulations, Ahmad used the funds he received from his Pakistani clients

3

to supply bridge loans to various Pakistani companies. The companies would repay the bridge loans by distributing rupees to the family members of Ahmad's clients. This method also allowed Ahmad to "bundle" numerous transfers into one transaction and thereby avoid multiple transaction fees. Ahmad's business dealings included many different companies, but he was charged with making false statements to the United States Customs Service only in relation to his association with Falcon Instruments.

Falcon Instruments imported surgical equipment manufactured in Pakistan for resale in the United States. During the relevant time period, the surgical instruments were non-dutiable goods. When a Pakistani manufacturer would ship the products, it would list on the invoice a significantly inflated purchase price. Upon receipt of the shipment, Falcon would request a "discount," which was generally the difference between the inflated invoice price and the price at which the manufacturer would make a small profit. Ahmad would then deposit an amount equal to the discount into Falcon's account--an account also maintained at First Virginia Bank. Falcon, in turn, would send the Pakistani manufacturer the full amount of the inflated invoice price, as required by Pakistani law, and the manufacturer would then grant the "discount" and distribute the difference between the inflated price and the "discounted" price to the family members of Ahmad's clients. Through this arrangement with Falcon, Ahmad transferred approximately $1.3 million to families in Pakistan. Falcon, for its part, caused Customs agents to list the inflated invoice price as the "transaction value" of the imported goods on Customs forms.

The government's investigation into all of these dealings ultimately resulted in the seizure and forfeiture of $186,587.42 pursuant to the criminal forfeiture statute, 18 U.S.C. § 982.

In Ahmad's criminal appeal, we affirmed his customs fraud and related conspiracy convictions under 18 U.S.C. § 542 (1994) and 18 U.S.C. § 371 (1994) respectively. However, we reversed Ahmad's convictions for structuring deposits to evade reporting requirements and for conspiracy to do so, and vacated the criminal forfeiture, because the government failed to prove that Ahmad "willfully" violated the anti-structuring statute, 31 U.S.C. § 5324(a)(3). At the time, only persons willfully violating § 5324 were subject to criminal pen-

alties. <u>See</u> 31 U.S.C. § 5322 (1994) (amended 1994); <u>Ismail</u>, 97 F.2d at 56, 59.

Shortly after issuance of our mandate in <u>Ismail</u>, Ahmad filed a motion for return of the seized funds; days later, on November 11, 1996, the government filed this action for civil forfeiture of these funds.**1** Ahmad intervened in the action to file a claim for the property. On January 21, 1998, after the United States and Ahmad stipulated as to all relevant facts, the district court entered judgment in favor of Ahmad finding no statutory basis for the forfeiture and concluding that, in any event, the forfeiture would constitute an excessive fine. On appeal, the government contends that (1) $85,000 of the defendant currency is forfeitable because it is directly traceable to the structuring violations; (2) the remaining $101,587.42 of the defendant currency is forfeitable as a substitute for property involved in customs fraud violations; and (3) civil forfeiture of the entire amount of the defendant currency does not constitute an excessive fine in violation of the Eighth Amendment.

We address each of these contentions in turn.

II.

The anti-structuring statute provides: "No person shall for the purpose of evading the reporting requirements of section 5313(a) [which requires banks to file currency transaction reports for any cash trans-

_____

**1** Congress has recently approved new legislation that enhances the government's burden of proof in civil forfeiture proceedings. <u>See</u> Civil Asset Forfeiture Reform Act of 2000, H.R. 1658, 106th Cong. § 2(c). This legislation, if signed by the President, will require the government "to establish, by a preponderance of the evidence, that the property is subject to forfeiture." <u>Id.</u>; <u>see infra</u> Part III. The bill also provides a "gross disproportionality" standard for determining whether a civil forfeiture is constitutionally excessive and places the burden on the claimant to "establish[ ] that the forfeiture is grossly disproportional by a preponderance of the evidence." <u>Id.</u> at § 2(g); <u>see infra</u> Part IV. The Act applies "to any forfeiture proceeding commenced on or after the date that is 120 days after the date of enactment," <u>id.</u> at § 21, and thus would not apply to the present action.

5

action exceeding $10,000] . . . structure or assist in structuring, or attempt to structure or assist in structuring any transaction." 31 U.S.C. § 5324(a)(3); see also 31 C.F.R. § 103.22(b)(1) (1999). In the prior criminal action, we reversed Ahmad's convictions under 31 U.S.C. § 5322 for "willfully violating" the anti-structuring statute because the government failed to prove, as required by Ratzlaf v. United States, 510 U.S. 135 (1994), that Ahmad knew that structuring violated the law. See Ismail, 97 F.3d at 59. In 1994, Congress amended § 5322 to eliminate the willfulness requirement with respect to structuring violations under § 5324, see Pub. L. No. 103-325, § 411(c)(1), 108 Stat. 2160, 2253 (1994), but at the time of the structuring involved in this case, a defendant's knowledge of the illegality of the structuring was necessary to trigger the criminal penalties in § 5322. See Ismail, 97 F.3d at 56, 59. However, even prior to amending § 5322, Congress had provided for civil forfeiture--"without any `willfulness' requirement," see Ratzlaf, 510 U.S. at 146 n.16--of property "involved in a transaction . . . in violation of [the anti-structuring statute]." Thus, the government could obtain the forfeiture of assets involved in a transaction that was illegally structured under § 5324 even when no individual could be held liable for the illegal transaction under § 5322.

The case at hand, of course, is a civil in rem forfeiture action. Contrary to the understanding of the district court, the government seeks, pursuant to 18 U.S.C. § 981(a) (1994), forfeiture of $85,000 of the defendant currency as property involved in a transaction violating the anti-structuring statute, 31 U.S.C. § 5324. The $85,000 meets this criterion because the parties have stipulated that this amount "is directly traceable to deposits structured so as to avoid the reporting requirements." Accordingly, as Ahmad concedes, unless this $85,000 constitutes an excessive fine, see infra Part IV, it is subject to forfeiture in this action.

III.

The government argues that the remaining portion of the defendant currency, $101,587.42, is forfeitable under 18 U.S.C. § 545 as substitute assets for the value of the imported surgical equipment introduced into the United States through the use of fraudulent invoices. Section 545 provides that merchandise introduced into the United States by smuggling, clandestine activity, or fraudulent invoicing, or

6

"the value" of such merchandise "recovered from" a person engaging in such activity "shall be forfeited to the United States." 18 U.S.C. § 545. In order to effect the forfeiture, the government must demonstrate probable cause that a violation of § 545 has occurred. See 28 U.S.C. § 2461 (1994); United States v. An Antique Platter of Gold, 991 F. Supp. 222, 230 (S.D.N.Y. 1997), aff'd, 184 F.3d 131 (2d Cir. 1999); United States v. One 18th Century Colombian Monstrance, 802 F.2d 837, 838 (5th Cir. 1986). An unrebutted probable cause showing will suffice to justify the forfeiture. See, e.g., United States v. Thomas, 913 F.2d 1111, 1114 (4th Cir. 1990).

To satisfy its burden of demonstrating probable cause that a § 545 violation occurred, the government relies on the asserted collateral estoppel effect of Ahmad's criminal convictions, which we have affirmed, for conspiracy to defraud the United States under 18 U.S.C. § 371 and customs fraud under 18 U.S.C. § 542 (which is violated when a person "introduces . . . into the commerce of the United States any imported merchandise by means of any fraudulent or false . . . statement").

Ahmad fails to offer any evidence to rebut this probable cause showing. Instead, he maintains that § 545 must be interpreted so as to require the government to prove an intent to defraud the United States of "revenues," which he admits is not a requirement of § 542. The district court relied on this interpretation to hold that the government failed to demonstrate probable cause that § 545 had been violated. The court reasoned that because the surgical equipment was not subject to duty, the customs forms overstating the value of the equipment did not deprive the government of revenues but only of accurate information.

The first paragraph of § 545 provides in relevant part that anyone who "knowingly and willfully, with intent to defraud the United States . . . makes out or passes . . . through the customhouse any false, forged, or fraudulent invoice, or other document or paper" violates federal law. 18 U.S.C. § 545. Thus, the first paragraph of the statute plainly does not require that the United States be deprived of "revenues" in order for a violation of the statute to occur.

The predecessor statutes to this portion of § 545, the Tariff Acts of 1842 and 1930, did require an intent to defraud the "revenues of the

7

United States." See Act of June 17, 1930, ch. 497, 46 Stat. 751 (codified at 19 U.S.C. § 1593 (1940)), repealed by Act of June 25, 1948, ch. 645, 62 Stat. 862. In 1948, those predecessor statutes were recodified in § 545 and the words "the revenues of" deleted. See Act of June 25, 1948, ch. 645, 1948 U.S.C. Cong. Serv. (62 Stat. 716) 695, A 369-70. Until 1994, our sister circuits had uniformly given effect to the plain language of the recodified statute and held a violation of § 545 need not be based on an intent to defraud the United States of "revenues." See, e.g., United States v. Borello, 766 F.2d 46, 51-52 (2d Cir. 1985); United States v. Kurfess, 426 F.2d 1017, 1019 (7th Cir. 1970); United States v. Boggus, 411 F.2d 110, 113 (9th Cir. 1969).

In holding to the contrary, the district court relied on the Third Circuit's more recent decision in United States v. Menon, 24 F.3d 550 (3d Cir. 1994). The Menon court ruled that"the meaning of `defraud' must be interpreted in the context of the particular statute that uses the term. . . . [A]n intent to defraud generally requires an intent to deprive someone of property or money but does not generally require such an intent in the context of statutes making it illegal to defraud `the United States' . . . unless there is countervailing evidence on the meaning of the statute." Id. at 556. The Third Circuit identified as "countervailing evidence" the legislative history of the 1948 revision of the United States Code, specifically, the House Report, which explains that Congress did not intend any substantive changes unless explicitly discussed in the Reviser's Notes. Id. at 556-57. Because the Reviser's Note to § 545 states only that "[c]hanges were made in phraseology" and fails to discuss the impact of deleting the words "the revenues of," the Menon court held that Congress did not intend to work a substantive change in the statute by interpreting "to defraud the United States" more broadly. Id.

In other words, the Third Circuit in Menon relied on a negative inference, based on the Reviser's Note, to construe§ 545 contrary to the statute's plain language. This seems to us a perilous course, at odds with the Supreme Court's repeated admonition that statutory construction begins with examining the language of the statute, and that when the language is clear, the judicial inquiry "in all but the most extraordinary circumstance, is finished." See, e.g., Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 475 (1992).

8

The Supreme Court's recent decision in United States v. Wells, 519 U.S. 482, 497 (1997), heightens our unease with the Menon rationale. There the Court specifically refused to extend similar interpretive deference to the Reviser's Notes. The statute at issue in Wells, 18 U.S.C. § 1014 (1994), makes it a crime to knowingly make false statements to a federally insured bank. Notwithstanding language in some of § 1014's statutory predecessors establishing a falsehood's materiality as an element of the offense and the Reviser's Note that the consolidation of many prior provisions into one statute"was without change of substance," 519 U.S. at 496, the Wells Court refused to hold that materiality was an element of § 1014 given the lack of any such requirement in the statutory language.

The Court explained that the Reviser's Note did"nothing to muddy the ostensibly unambiguous provision of the statute as enacted by Congress, . . . [and] the revisers' assumption that the consolidation [of various provisions] made no substantive change was simply wrong. . . . Those who write revisers' notes have proven fallible before." Id. at 497; see also United States v. Robinson, 147 F.3d 851, 853 (9th Cir. 1998) (rejecting the Menon rationale and holding instead that § 545 "protects governmental interests extending beyond mere property rights," and thus, "the intent to defraud element . . . should be construed as meaning intent to avoid and defeat the United States customs laws, . . . rather than the narrower construction `intent to deprive the United States of revenue'"); United States v. Nathan, 188 F.3d 190, 204 (3d Cir. 1999) (citing Robinson, rather than its own decision in Menon, and noting that a number of courts have applied a broad construction to the intent to defraud element of§ 545).**2**

_____

**2** Moreover, Ahmad's reliance on McNally v. United States, 483 U.S. 350 (1987), to support the Menon interpretation of § 545 is misplaced. McNally narrowly construed "defraud" in the mail fraud statute, 18 U.S.C. § 1341, but the scope of that statute, unlike § 545, is not limited to frauds victimizing the United States. The McNally Court distinguished the mail fraud statute from another statute, 18 U.S.C. § 371--which criminalizes conspiracies "to defraud the United States"--and cited with approval the Supreme Court's earlier rulings in Hammerschmidt v. United States, 265 U.S. 182 (1924), and Hass v. Henkel, 216 U.S. 462 (1910), both of which adopted the broader interpretation of "defraud" for "statute[s] which ha[ve] for [their] object the protection and welfare of the government alone." 483 U.S. at 358 n.8 (quoting Cupley v. United States, 130 F. 1, 7 (1st Cir. 1904)).

9

In sum, the plain language of § 545 does not require the government to prove that it suffered a loss of revenue any more than § 542 does. Ahmad has failed to articulate any compelling reason why we should not follow the statutory language. Therefore, Ahmad's conviction for conspiracy to violate § 542 satisfies the government's burden of demonstrating probable cause that a violation of § 545 has occurred. Accordingly, § 545 entitles the government to civil forfeiture of the $101,587.42 recovered from Ahmad as a portion of "the value" of the surgical equipment introduced into this country in violation of that statute, but only if this forfeiture does not constitute an excessive fine prohibited by the Eighth Amendment.

We now turn to that analysis.

IV.

The Eighth Amendment prohibits the imposition of "excessive fines." U.S. Const. amend. VIII. In recent years, the Supreme Court has held that this prohibition applies even to certain in rem civil forfeitures, and has provided guidance as to when forfeitures constitute "excessive fines."

A.

In Austin v. United States, 509 U.S. 602, 610 (1993), the Court held that the limitations imposed by the Excessive Fines Clause of the Eighth Amendment apply to in rem civil forfeiture proceedings if the forfeiture, at least "in part," constitutes punishment. The defendant in Austin, who had sold two grams of cocaine, pled guilty to one count of possession with intent to distribute cocaine. Pursuant to 21 U.S.C. §§ 881(a)(4) and (a)(7), the government then filed an in rem civil action seeking forfeiture of his mobile home, where he stored the cocaine, and his auto body shop, where he sold the drugs; the defendant challenged the forfeiture as punitive and violative of the Eighth Amendment's Excessive Fines Clause.

In resolving this question, the Austin Court surveyed the historical development of forfeiture law, id. at 611-18, and concluded "that forfeiture generally and statutory in rem forfeiture in particular histori-

10

cally have been understood, at least in part, as punishment." Id. at 618. The Court then noted that the "innocent owner" defense provided in § 881 and in many other modern forfeiture statutes "makes them look more like punishment, not less," than traditional forfeiture statutes containing no such defense. Id. at 619.

The government nonetheless maintained that the forfeitures in Austin were remedial rather than punitive because they "removed the `instruments' of the drug trade, `thereby protecting the community from the threat of continued drug dealing.'" Id. at 620. The Supreme Court acknowledged that it had "recognized that the forfeiture of contraband itself may be characterized as remedial," but noted that it "previously ha[d] rejected government's attempt to extend that reasoning to conveyances used to transport illegal liquor." Id. at 621. Without further analysis of the history or character of instrumentality forfeitures, the Austin Court concluded that the "Government's attempt to characterize" the mobile home and auto body shop "as `instruments' of the drug trade must meet the same fate as Pennsylvania's [unsuccessful] effort to characterize" a car used to transport illegal liquor as forfeitable "contraband." Id. (citing One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 699 (1965)).

Although the Austin Court concluded that forfeiture of the mobile home and body shop were "properly considered punishment" and so subject to the limitations of the Excessive Fines Clause of the Eighth Amendment, id. at 619, 622, it refused to establish any test "for determining whether a forfeiture is constitutionally `excessive.'" Id. at 622. Rather it remanded the case to allow the lower courts to consider in the first instance whether the challenged forfeitures were excessive. Id. at 622-23.

Just two terms ago, in United States v. Bajakajian, 524 U.S. 321 (1998), the Supreme Court again considered these questions, and, for the first time, articulated a test for determining whether a punitive forfeiture violates the Excessive Fines Clause. Bajakajian involved an international traveler who, on one occasion, failed to declare that he was carrying currency in excess of $10,000 out of the United States in violation of the reporting requirements under 31 U.S.C. § 5316 (1994). The government brought criminal proceedings against the traveler under 18 U.S.C. § 982(a)(1) (1994) seeking forfeiture of the

11

$357,144 it had seized from him; the defendant maintained that the forfeiture was a constitutionally excessive fine.

In the course of concluding that forfeiture of $357,144 did indeed constitute an excessive fine, the Supreme Court first revisited the punitive versus remedial distinction. It quickly concluded that the forfeiture before it--an in personam, criminal forfeiture under § 982 that "cannot be imposed upon an innocent owner of unreported currency" --constituted punishment and so triggered the excessive fines inquiry. See Bajakajian, 524 U.S. at 328. The Court did not, however, limit itself to analyzing the nature of criminal in personam forfeitures, which it deemed to be per se punitive. As in Austin, the Court discussed the nature of civil in rem forfeitures and reiterated Austin's holding that even if a forfeiture served some remedial purpose, it would still be subject to analysis as a possibly excessive fine if it were punitive "in part." Id. at 329 n.4.

But rather than following Austin's view that traditional civil in rem forfeitures "historically have been understood, at least in part, as punishment," 509 U.S. at 618, the Bajakajian Court concluded that "[t]raditional in rem forfeitures were . . . not considered punishment." 520 U.S. at 331. Indeed, the Court expressly stated that "[b]ecause they were viewed as nonpunitive, such forfeitures traditionally were considered to occupy a place outside the domain of the Excessive Fines Clause." Id. The Bajakajian Court noted, however, that because "some recent federal forfeiture laws have blurred the traditional distinction between civil in rem and criminal in personam forfeiture," not "all modern civil in rem forfeitures are nonpunitive." Id. at 331 n.6 (emphasis added). Nonetheless, the Bajakajian analysis and language significantly limit Austin's apparent conclusion that traditional civil in rem forfeitures generally are punitive to some degree.

The Bajakajian Court's consideration of the government's argument that the unreported currency it sought to have forfeited was an "instrumentality" of the offense, and therefore nonpunitive, mirrors this change in approach. Rather than rejecting any instrumentality argument out of hand, as the Austin Court seemingly did, the Bajakajian Court recognized that "[i]nstrumentalities historically have been treated as a form of `guilty property' that can be forfeited in civil in rem proceedings." Id. at 333. The Court concluded, however, that the

12

instrumentality question was "irrelevant" in the case before it because the government did not bring a civil in rem action against the currency but "sought to punish [Bajakajian] by proceeding against him criminally, in personam." Id. Alternatively, the Court noted that "[t]he currency in question [was] not an instrumentality in any event" because it did nothing to facilitate the offense; rather it was "merely the subject of the crime of failure to report." Id. at 334 n.9.

Having determined that the forfeiture of the currency was punitive, the Bajakajian Court turned to evaluating the excessiveness of the forfeiture. Because "judgments about the appropriate punishment for an offense belong in the first instance to the legislature" and "any judicial determination regarding the gravity of a particular offense will be inherently imprecise," the Court held that there need not be "strict proportionality between the amount of a punitive forfeiture and the gravity of a criminal offense." Id. at 336. Rather a punitive forfeiture will be held to violate the Excessive Fines Clause only if it is "grossly disproportional" to the gravity of the offense. Id. at 334, 337.

In deciding whether the forfeiture before it was grossly disproportional to the offense, the Bajakajian Court considered the nature and extent of the criminal activity, its relation to other crimes, its penalties, and the harm it caused. First, the Court noted that the crime at issue was "solely a reporting offense," explaining that transporting currency out of the country is lawful as long as the currency is reported. Id. at 337. Second, the Court emphasized that this "single" reporting offense, id. at 337 n.12, "was unrelated to any other illegal activities"--the currency was produced by and used for legal activities. Id. at 338. Third, the Court focused on the penalties for the offense. It recognized that the maximum statutory penalty (a $250,000 fine and five years imprisonment) was "certainly relevant evidence" of the offense's gravity, but determined that "the maximum sentence that could have been imposed on [Bajakajian]" under the Sentencing Guidelines (a $5,000 fine and six months imprisonment) "confirm[ed] a minimal level of culpability" in Bajakajian's case. Id. at 338-39 & n.14. Finally, the Court determined that the harm caused by the offense was also minimal:

> Failure to report his currency affected only one party, the Government, and in a relatively minor way. There was no

13

fraud on the United States, and respondent caused no loss to the public fisc. Had his crime gone undetected, the Government would have been deprived only of the information that $357,144 had left the country.

Id. at 339. For these reasons, the Court held that the forfeiture of $357,144 for a single reporting violation, unrelated to any other illegal activity, and harming only the United States "in a relatively minor way," constituted an excessive fine in violation of the Eighth Amendment.

B.

In light of the principles enunciated in Bajakajian and Austin, we believe that forfeiture of the $85,000 of the currency traceable to the deposit structuring offenses under 31 U.S.C. § 5324 withstands constitutional scrutiny.

1.

We first consider whether this $85,000 constitutes an instrumentality of the structuring offenses; if it does, forfeiture of that amount in this civil in rem action does not trigger the excessiveness inquiry.

As previously discussed, Bajakajian expressly concluded that "[i]nstrumentalities historically have been treated as a form of `guilty property' that can be forfeited in civil in rem proceedings." Id. at 333. Moreover, although the Bajakajian Court noted the strict historical limits on what may be considered an instrumentality (such forfeitures are confined "to the property actually used to commit an offense and no more," id. at 333 n.8), the Court did not repudiate the established treatment of instrumentalities as forfeitable. Thus, not only did the Bajakajian Court recognize as the well-established rule that true civil in rem instrumentality forfeitures are exempt from the excessive fines analysis, but it also did nothing to change or limit this rule.

Of course, in Bajakajian, the Court concluded that the forfeiture before it did not constitute an instrumentality forfeiture. It found the instrumentality inquiry "irrelevant" because no "guilty property" had

14

been "forfeited in civil in rem proceedings;" rather the government had brought criminal in personam forfeiture proceedings against Bajakajian. Id. at 333. In the case at hand, the government has brought a civil in rem proceeding against the currency. Thus, the principal ground for rejecting the instrumentality inquiry in Bajakajian-- irrelevance--simply does not apply here; the instrumentality inquiry is certainly relevant in this case.

Ruling in the alternative, the Court in Bajakajian accepted the argument that because the existence of the forfeited currency was a "precondition" to the reporting requirement under 31 U.S.C. § 5316, it could not be an instrumentality of the offense. Id. at 334 n.9. Whether this rationale applies to the present case is a close question. The statute involved here, like that at issue in Bajakajian, implicates a reporting requirement, but it is less clear than in Bajakajian that the forfeited currency seized in this case constituted a precondition to the reporting requirement. The anti-structuring statute mandates that all cash transactions in excess of $10,000 be reported. See 31 U.S.C. § 5324(a). Thus, the "precondition" to this reporting requirement is a cash transaction in excess of $10,000. Arguably, no portion of the defendant funds traceable to the structured transactions can be deemed a "precondition" to this requirement because all such funds were broken down into deposits of less than $10,000 so as to circumvent the requirement, thus causing First Virginia Bank to fail to file the required cash transaction reports. Put another way, the unreported funds in Bajakajian could not constitute an "instrumentality" of the crime of failure to report--a crime of "pure omission"--because "the offense [wa]s not doing something but doing nothing." United States v. $145,139.00 in United States Currency, 18 F.3d 73, 80 (2d Cir. 1994) (Kearse, J., dissenting). In contrast, Ahmad's structuring was not just an "omission," but "an affirmative act of concealment," id., and thus the structured funds arguably could constitute an instrumentality of that concealment.

Although there is certainly a respectable argument that the $85,000 traceable to the structuring offenses is an instrumentality forfeiture, several factors make us hesitate to so hold. First, of course, the facts here are undeniably very close to those in Bajakajian, where the Supreme Court held the currency did not constitute an instrumentality forfeiture. The factual similarity of the two cases acquires special sig-

15

nificance when considered in conjunction with the Bajakajian Court's teaching that instrumentality forfeitures have been subject to "strict historical limitation," and any forfeiture reaching beyond this limitation "is ipso facto punitive and therefore subject to review under the Excessive Fines Clause." 524 U.S. at 333 n.8. Holding the currency involved in the reporting violation here to constitute an instrumentality after the Supreme Court has recently held that the currency involved in a similar reporting violation in Bajakajian did not constitute an instrumentality would, at the very least, be in tension with the view that instrumentality forfeitures are "strict[ly] . . . limit[ed]."**3**

Moreover, the Supreme Court has never held that a non-contraband subject of criminal regulation can be forfeited as an instrumentality of an offense under that regulation. In this respect, the $85,000 obviously differs from the instrumentality forfeitures the Court has upheld, e.g., the forfeiture of a distillery and related property used to produce illegal alcohol in Dobbins's Distillery v. United States, 96 U.S. 395 (1878), the forfeiture of a car used to violate a ban on interstate transportation of goods to avoid taxes in J.W. Goldsmith, Jr.-

_____

**3** Section 981, like the statutes at issue in Austin and Bajakajian, contains a defense for innocent owners of seized property. 18 U.S.C. § 981(a)(2). This might constitute another reason for refusing to characterize the forfeiture of $85,000 as an instrumentality forfeiture because both Austin and Bajakajian cite the innocent owner defense in support of the punitive nature of the forfeitures at issue in those cases. However, Bajakajian, in recognizing that instrumentalities can be forfeited in civil in rem proceedings without being subjected to any excessiveness inquiry, did not in any way suggest that an "innocent owner" provision supersedes the instrumentality inquiry. See also United States v. 3814 NW Thurman St., 164 F.3d 1191, 1197 (9th Cir.) (suggesting that even if § 981 is deemed punitive, a civil forfeiture under that statute will not be subject to the excessiveness inquiry if the property targeted by the in rem proceeding "meet[s] the `instrumentality' test," quoting Bajakajian, 524 U.S. at 333 n.8), amended on denial of reh'g, 172 F.3d 689 (1999); cf. United States v. Ursery, 518 U.S. 267, 290, 292 (1996) (finding that § 981(a)(1)(A) "serve[s] important nonpunitive goals" and "[t]hough both §§ 881(a) and 981(a) contain an `innocent owner' exception, we do not think that such a provision, without more indication of an intent to punish, is relevant to the question whether a statute is punitive under the Double Jeopardy Clause").

16

Grant Co. v. United States, 254 U.S. 505, 508 (1921), the forfeiture of fishing nets used to violate state fishing laws in C.J. Hendry Co. v. Moore, 318 U.S. 133 (1943), and the forfeiture of real property used to grow marijuana in Ursery, 518 U.S. at 267. Although it seems logically possible that the subject of a regulation could constitute an instrumentality of an offense under that regulation, the Bajakajian Court suggested to the contrary, distinguishing the traditional instrumentality in Goldsmith from the forfeiture before it in which "the currency is merely the subject of the crime of failure to report." Bajakajian, 524 U.S. at 334 n.9.

In sum, it is not clear whether the Supreme Court would hold that a forfeiture of structured funds constitutes an instrumentality forfeiture. We need not resolve that question in this case, however, because even if the $85,000 is not an instrumentality, and the Excessive Fines Clause applies, we conclude for the reasons that follow that forfeiture of these funds is not constitutionally excessive.

2.

Although the Supreme Court has not yet expressly so held, we believe that Bajakajian's "grossly disproportional" analysis applies when determining whether any punitive forfeiture--civil or criminal --is excessive.**4** Moreover, as Bajakajian instructs, we consider de

_____

**4 Bajakajian**, of course, involved only a criminal in personam forfeiture, but the Supreme Court nowhere suggested that its "gross disproportionality" test did not apply to civil in rem forfeitures that are punitive in nature. Indeed, the Court implied the contrary by stating that "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality" and that it was enunciating "a standard" for "punitive forfeiture[s]." Bajakajian, 524 U.S. at 334 (emphasis added). Moreover, Justice Kennedy, on behalf of the four dissenters in Bajakajian, acknowledged that the "grossly disproportional" standard was "a proper way to apply the Clause." Id. at 348. Furthermore, a number of our sister circuits have similarly concluded that the "grossly disproportional" standard does indeed apply to punitive civil forfeitures, thus filling the void previously left by the Supreme Court in Austin, 509 U.S. at 622-23. See Towers v. City of Chicago , 173 F.3d 619, 624 (7th Cir. 1999); 3814 NW Thurman St., 164 F.3d at 1197; United States v. 415 E. Mitchell Ave., 149 F.3d 472, 476-77 (6th Cir. 1998).

17

novo the question of whether a forfeiture constitutes a constitutionally excessive fine, see 524 U.S. at 336 & n.10, and we place the burden on Ahmad, as the party challenging the constitutionality of the forfeiture, to demonstrate excessiveness. See Bajakajian, 524 U.S. at 348 (Kennedy, J., dissenting) ("[a] defendant must prove a gross disproportion . . . ."); see also United States v. Ladum, 141 F.3d 1328, 1349 (9th Cir. 1998); United States v. 829 Calle de Madero, 100 F.3d 734, 738 (10th Cir. 1996); United States v. One 1970 36.9' Columbia Sailing Boat, 91 F.3d 1053, 1057 (8th Cir. 1996).

Examination of the relevant factors identified in Bajakajian for assessing the gravity of the offense--the nature and extent of the criminal activity, other related illegal activities (such as drug dealing, money laundering, or tax evasion), the extent of the harm caused by the offense, and the maximum penalties a court could have imposed for the offense--renders inevitable the conclusion that Ahmad cannot satisfy his burden of demonstrating that forfeiture of $85,000 in structured funds is constitutionally excessive.[5]

As to the nature and extent of the criminal activity, although both the case at hand and Bajakajian involve the violation of reporting requirements, Ahmad's structuring did not violate a lone reporting duty imposed on him as an individual. Rather, his structured deposits were for a commercial purpose and caused a financial institution, First Virginia Bank, to fail on numerous occasions to comply with its reporting obligations. Ahmad's conduct may not have been willful, but he repeatedly structured transactions involving his clients' money

_____

[5] In this case, the district court issued its decision prior to the Supreme Court's decision in Bajakajian. In finding the forfeitures to be excessive fines, the district court instead followed the Ninth Circuit's analysis in United States v. Bajakajian, 84 F.3d 334, 337 (9th Cir. 1996), aff'd, 524 U.S. 321 (1998), relying heavily (if not exclusively) on the fact that the government was deprived only of information, not revenue, as a result of the reporting offenses. Many of Ahmad's arguments echo this rationale. We agree with the government, however, that"if any forfeiture where the United States was not deprived of revenue necessarily would constitute an excessive fine per se," see Brief of Appellant at 27, it would have been unnecessary for the Supreme Court in Bajakajian to identify and consider other factors relevant to the proportionality determination.

18

to evade reporting requirements. The nature of Ahmad's structuring is thus readily distinguishable from the "single" reporting offense at issue in Bajakajian, in which the property owner, out of "fear stemming from `cultural differences,'" tried to take his own money out of the country without reporting it. 524 U.S. at 326, 337 n.12.

Like Bajakajian, Ahmad's underlying activities--making cash deposits with the bank and transferring portions of that money out of the country--were lawful activities. However, unlike Bajakajian's isolated reporting violation, Ahmad's structuring constituted part of a complicated larger scheme related to customs fraud violations. Ahmad acknowledged that he transferred some of the funds from his illegally structured deposits into Falcon's account so that Falcon could pay Pakistani manufacturers inflated purchase prices for imported surgical equipment. The structured transactions thus bore an intimate connection to the customs fraud. In contrast to Bajakajian, who on one occasion sought to use unreported funds to repay a lawful debt, see id. at 326, Ahmad repeatedly sought to use structured funds to violate United States customs laws and to circumvent Pakistani monetary regulations.

In assessing the harm caused by the offense, the Bajakajian Court stressed that in the case before it, the harm was minimal because the offense resulted only in a loss of information to the government. In the present case, Ahmad's deposit structuring activities not only caused the government to lose information, but also implicated an intermediary actor, the First Virginia Bank, and affected its legal duty to report certain transactions. In addition, the structured deposits put at risk the funds of numerous Pakistani nationals living in the United States; only because "Ahmad borrowed funds in Pakistan and delivered the expected sums to the families of his customers in Pakistan," see Brief of Appellee at 9, did the government's seizure of the funds not deprive Ahmad's clients of their money.

The penalties that a court "could have . . . imposed" for the conduct giving rise to the forfeiture here do mirror those in Bajakajian--a statutory maximum term of imprisonment of five years, a maximum fine of $250,000, or both, and a Guidelines recommendation of a term of imprisonment not more than six months, a maximum fine of $5,000, or both. See 31 U.S.C. §§ 5322(a), 5324(c)(1) (1994);

19

U.S.S.G. § 2S1.3;**6** Bajakajian, 524 U.S. at 339 n.14. However, we do not believe that in this case these penalties " confirm a minimal level of culpability" as they did in Bajakajian, id. at 339, given the distinctions we have drawn with respect to the other factors relevant to evaluating the gravity of the underlying offense.

In sum, unlike Bajakajian's offense for which the government sought forfeiture of more than $350,000, Ahmad's conduct in violation of § 5324 was not a single, isolated untruth affecting only the government, but rather a series of sophisticated commercial transactions over a period of years that were related to a customs fraud scheme. Ahmad's structuring not only deprived the government of important information, but also affected a financial institution's ability to comply with the law and jeopardized the funds of other persons. For these reasons, Ahmad cannot demonstrate that forfeiture of the $85,000 traceable to the structuring offenses (less than one fourth of the forfeiture sought in Bajakajian) is grossly disproportional to those offenses.

C.

For many of the reasons stated above, on the undisputed facts here, Ahmad cannot demonstrate that forfeiture of the remaining amount of the defendant currency, $101,587.42, is grossly disproportional to the offenses under 18 U.S.C. § 545.**7**  Even assuming that the forfeiture is at least in part punitive, it does not violate the Excessive Fines Clause.

_____

**6** We note that the Guidelines calculation extends Ahmad substantial lenience because it assumes that he did not know that the structured funds were intended to promote unlawful activity, i.e., customs fraud. See U.S.S.G. § 2S1.3. Without the benefit of this assumption, Ahmad's base offense level could be calculated as high as 15, with a corresponding maximum sentence of 24 months custody, a $40,000 fine, or both.

**7** The government does not claim that the $101,587.42 constitutes an instrumentality forfeiture, but it does argue that the excessiveness analysis does not apply to the forfeiture of these funds for a different reason. The government contends that, even though § 545 does not require proof that the United States has been defrauded of "revenues," see supra Part III, and even though the customs violations here did not defraud the government of any revenues (because the surgical equipment was not subject

20

The nature of the § 545 offenses in the present case is defined by the use of fraudulent invoices that prevented Customs agents from accurately documenting the value of imported non-dutiable goods. Thus, these particular customs violations may arguably be considered a breed of "reporting offense," as was Bajakajian's failure to declare the actual amount of currency he was transporting out of the country. However, presenting Customs with false invoices constitutes an affirmative action and clearly worked a "fraud on the United States," unlike Bajakajian's failure to make a declaration. Bajakajian, 524 U.S. at 339. In addition, as with the structuring violations, the customs violations do not constitute a single isolated crime. Rather,

_____

to duty), § 545 is a traditional customs smuggling statute serving "entirely remedial" purposes, Bajakajian, 524 U.S. at 343 n.19, and so "beyond limitation under the Eighth Amendment." Brief of Appellant at 29. But Bajakajian expressly rejected a similar argument (albeit in the context of a criminal in personam forfeiture), explaining that remedial actions are "brought to obtain compensation or indemnity" not information. 524 U.S. at 329 (internal quotation marks eliminated). Moreover, the Court emphasized that traditional customs smuggling forfeitures "vindicate[d] the Government's underlying property right in customs duties." Id. at 340. Bajakajian's extended discussion suggests that a modern statute, like § 545, which is not limited in purpose to compensating the government for lost customs duties, could not, contrary to the government's argument, be characterized as a traditional customs smuggling statute. Nor does One Lot Emerald Cut Stones v. United States, 409 U.S. 232 (1972), assist the government. That case involved a forfeiture pursuant to 19 U.S.C. § 1497 of gems subject to duty that had been smuggled into the United States. The Emerald Cut Court itself distinguished the statute at issue here, § 545, from the "civil and remedial" forfeiture under § 1497. See id. at 236-37. Moreover, although the Emerald Cut Court justified the forfeiture of gems not only as "prevent[ing] forbidden merchandise from circulating in the United States" but also as serving to "reimburse the Government for investigation and enforcement expenses," id. at 237, the second justification (the only one relevant here) was wholly discounted by the Bajakajian Court. Bajakajian, 524 U.S. at 343 n.19 ("The additional fact that such a remedial forfeiture also `serves to reimburse the Government for investigation and enforcement expenses,' is essentially meaningless, because even a clearly punitive criminal fine or forfeiture could be said in some measure to reimburse for criminal enforcement and investigation.") (citations omitted).

21

fraudulent invoices, for which Ahmad was responsible, repeatedly passed through Customs. The nature and extent of the criminal activity here, therefore, contrasts sharply with Bajakajian's isolated reporting violation.

As to related illegal activities, the importation of the surgical equipment was a legal activity and there is no evidence in the record that the currency itself--as substitute assets for the value of the imported surgical equipment--was tainted in any way by prior unlawful conduct. However, the § 545 violations were directly related to tax fraud because Falcon's president used the false invoices unlawfully in filing his tax returns, see Ismail, 97 F.3d at 54-55, and indirectly related to Ahmad's structuring violations because Ahmad used the invoices as a basis for extending bridge loans and disbursing rupees to Pakistani families as part of his money exchange business. See supra at 27-28. Bajakajian's one reporting crime, of course, had no similar relationship to sophisticated criminal activity which occurred over a number of years.

The harm caused by the § 545 offenses is far greater than that caused by the single § 5316 reporting offense in Bajakajian. The false invoices in this case not only deprived the government of accurate statistical information required by customs regulations, but they were also used by Falcon's president to commit tax fraud, causing the government to lose approximately $370,000 of tax revenue in 1990 and 1991. The fraudulent scheme also threatened the interests of Ahmad's clients by making the monetary disbursements to Pakistani families contingent upon use of the false invoices.

Finally, once again the maximum penalties a court could impose are identical to those in Bajakajian. See 18 U.S.C. §§ 545, 3559(a)(5), 3571(b)(3); U.S.S.G. § 2T3.1(a)(3) (defining "tax loss" as the amount of the duty). But again, in light of the differences between the case at hand and Bajakajian as to the other factors, we do not believe that this diminishes the gravity of the fraudulent activity in which Ahmad was involved such that it is grossly disproportional to the $101,587.42 forfeiture.

In weighing all of these relevant factors, we can only conclude that Ahmad simply cannot demonstrate that forfeiture of the remaining

22

$101,587.42 of the defendant currency is grossly disproportional to the gravity of the § 545 offenses. Repeatedly bringing merchandise into the United States as part of a sophisticated commercial operation to defraud the United States through the use of false invoices-- invoices later used to commit tax fraud--constitutes substantially more serious criminal conduct than an individual's failure on one occasion to report accurately the amount of currency he was taking out of the country for a lawful, personal purpose, and which only deprived the government of information. The forfeiture of $101,587.42 (less than one third the amount sought to be forfeited in Bajakajian) is not grossly disproportional to the gravity of the customs fraud offenses, and so, even if punitive, does not violate the Excessive Fines Clause of the Eighth Amendment. **8**

IV.

For these reasons, the judgment of the district court is

REVERSED.

_____

**8** We have also carefully considered Ahmad's argument that the government impermissibly delayed instituting civil forfeiture proceedings in violation of his Fifth Amendment due process rights, and we find this argument meritless.